# EXHIBIT A

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1        BEFORE THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
2


3
UNITED STATES OF AMERICA,    .
4                            .
              Plaintiff      .          Case Number 21-cr-247
5                            .
vs.                          .
6                            .          Washington, D.C.
BRADLEY WAYNE WEEKS,         .          December 9, 2022
7                            .          10:00 a.m.
              Defendant.     .
8    - - - - - - - - - - - - - -


9                        BENCH TRIAL

10                       **DAY 2 OF 2**

11        BEFORE THE HONORABLE THOMAS F. HOGAN

12            UNITED STATES DISTRICT JUDGE


13
APPEARANCES:
14   For the United States:        JAMIE CARTER, ESQ.
                                   KATHRYN FIFIELD, ESQ.
15                                 U.S. Department of Justice
                                   1301 New York Avenue Northwest
16                                 Washington D.C. 20005

17   For the Defendant:            MATTHEW R. KACHERGUS, ESQ.
                                   ELIZABETH WHITE, ESQ.
18                                 Sheppard, White, Kachergus &
                                   DeMaggio, P.A.
19                                 215 Washington Street
                                   Jacksonville, Florida 32202

20

21   Official Court Reporter:      Sherri Grubbs,
                                   RPR, RMR, CRR, RDR
22                                 333 Constitution Ave.
                                   Room 4704-B
23                                 Washington, D.C. 20001
                                   202-354-3284
24
Proceedings recorded by stenotype shorthand.
25   Transcript produced by computer-aided transcription.

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1      (Proceedings held on December 9, 2022.)

2          THE CLERK:  Good morning, Your Honor.  This is

3  Criminal Matter 21-247(1), United States of America versus

4  Bradley Wayne Weeks.

5      Counsel, please approach the lectern and state your

6  appearance for the record, beginning with the government.

7          MS. CARTER:  Jamie Carter on behalf of the United

8  States.

9      Also at the table, I have Kate Fifield, also an AUSA;

10  Alexis Spencer-Anderson, our paralegal; and FBI --

11         THE COURT:  All right.  Thank you both.  All right.

12  Good morning.  Thank you.

13         MS. CARTER:  Thank you.

14         MR. KACHERGUS:  Good morning, Your Honor.  Matthew

15  Kachergus on behalf of Defendant Bradley Weeks, sitting at

16  counsel table, along with my partner, Elizabeth White.

17         THE COURT:  All right.  Thank you both for coming

18  in, getting ready to go this morning.

19      I see on my bench the agreement of a transcript of

20  selected exhibits.  They both submit an agreement as to 1.15

21  Exhibit.

22      It reads, "I have found out there's a Metro right at the

23  bottom of our hotel that goes all the way to the White House.

24  We can get off three blocks from the White House and walk to

25  it and then go from the White House to the Capitol Building.

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1    And from there, we can ride the Metro back here to the Embassy

2    Suites."

3         1.32.   "We are watching to the Capitol Building, ladies

4    and gentlemen, to show these Congressmen who runs America."

5         1.38.   "Breached the Capitol.  I'm going in.  We're going

6    in."

7         1.40.   "We reached the steps.  We've had to climb

8    scaffolding.  We had to climb ladders.  We've had to break

9    things to get through, but we've gotten through.  We've gotten

10   through, and we are taking back the Capitol.  We're taking

11   back our country.  This is our 1776.  This is where it's going

12   to happen.  This is where tyranny will fall.  This is where

13   America will rise.  Look at this, America, look at this."

14        1.88.   "I forgot to tell you that I played medic today.

15   That is, when we went in and they started pepper-spraying us,

16   some guys in front of us got the worst of it.  I mean, their

17   eyes were so red.  So I had, like, three or four bottles of

18   water in my backpack, and they were, like, laying on the

19   ground.  So I'm, like, medic down there.  I got their eyes

20   open, I'm pouring water in there, helping them all out of my

21   backpack.  So the water came in handy.  It helped some

22   patriots because they were rubbing their eyes with water, and

23   it was helping."

24        Signed by the counsel for the parties.

25        And this is the ones the Court had difficulty hearing

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1    that were played yesterday because the sound system didn't

2    portray those well.  I appreciate that, and I'll make notes of

3    that for my book of notes here.

4        All right.  We left off yesterday, the government had

5    rested their case.  Defense had moved for dismissal under the

6    rules appropriate.  I denied that.

7        The government had proffered one exhibit that was

8    objected to by counsel for the defendant, and I had overruled

9    that, finding it was -- the probative value was not outweighed

10   by any substantial prejudice to the defendant.

11       And we are at the point for the defendant to decide if

12   they wish to proffer testimony or witnesses at this time.

13       So we'll hear from Mr. Kachergus, who has the decision of

14   his client in this case.

15           MR. KACHERGUS:  Your Honor, after consulting with my

16   client, the defense rests.

17           THE COURT:  All right.

18           MR. KACHERGUS:  If you need to --

19           THE COURT:  Could I have Mr. Weeks come up, and I'll

20   just ask him a couple questions about his right to testify or

21   not.

22       Good morning, Mr. Weeks.

23           THE DEFENDANT:  Good morning, Your Honor.

24           THE COURT:  Thank you.

25       You have an absolute right to testify if you wish to.

1    You have an absolute right not to testify.  No one can compel
2    you or make you testify if you don't want to.  The fact you
3    did not testify cannot be used against you in the case.
4        So it's your decision.  If you wish to testify, no matter
5    what your lawyer says, you can do so.  If you don't wish to
6    testify, there's no impediment to doing that, and there's --
7    no inference can be taken from the failure you did not testify
8    by the Court, the trier of fact in this case.
9        So you've talked it over with Mr. Kachergus; is that
10   correct?
11            THE DEFENDANT:  Yes, Your Honor.  Yes, sir.
12            THE COURT:  All right.  And you've decided -- what
13   is your decision in this matter?
14            THE DEFENDANT:  I'm not going to testify.
15            THE COURT:  All right.  That's fine.  I appreciate
16   you.
17            MR. KACHERGUS:  Thank you, Your Honor.
18            THE DEFENDANT:  Thank you.
19            THE COURT:  All right.  Defense rests.
20        So the government has no rebuttal at this time then?
21            MS. CARTER:  Yes, Your Honor.
22            THE COURT:  Well, there's nothing else to offer
23   except the two exhibits.
24        So let's review the exhibits that you've admitted.  Are
25   there any other exhibits or any questions that have not been

1    admitted by either side they have any concerns about?

2              MS. CARTER:  No, Your Honor.

3         So we did the mass admission at the beginning of our

4    case, and I believe at that point we admitted all of the

5    evidence we intended to as far as the physical exhibits.

6              THE COURT:  And the defendant admitted a few of your

7    exhibits in his case.

8              MR. KACHERGUS:  If I may, Your Honor, I have the

9    revised Government's exhibit list, and I just would like to

10   ensure that a couple of exhibits that the defense did admit

11   are on that so that we capture the entire record.

12        I know 1.69 is part of the government's case, so I'm not

13   going to confirm that that's indeed on there.

14             THE COURT:  Let me go back to my list.  I made a

15   handwritten list.

16             MR. KACHERGUS:  That one was admitted.

17        However, I don't believe on the government's list but was

18   admitted was Exhibit 1.101.  And it was the photo of Mr. Weeks

19   with a sandwich in his hand.

20             THE COURT:  Is that with the sandwich?  Are you

21   talking about that one?

22             MR. KACHERGUS:  Uh-huh.

23             THE COURT:  Yeah.  We used that.  I think you put

24   that in --

25             MR. KACHERGUS:  During Agent McLeod's testimony.

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1          THE COURT:  -- yesterday afternoon.

2          MS. CARTER:  Yes, sir.

3          THE COURT:  Yes.  Okay.  That's admitted.  Make sure

4    it is.  All right.

5      And you had 1.69 you mentioned?

6          MR. KACHERGUS:  Yes, sir.  That's in the

7    government's -- or the stipulated exhibit list.

8          MS. CARTER:  Would it be useful if I read, and then

9    the defense can confirm, the list of exhibits that we're

10   talking about as being admitted?

11         THE COURT:  That's a long list to go through those

12   again.

13         MS. CARTER:  That's true.

14         MR. KACHERGUS:  I think there's only, I believe, two

15   other ones.  So if I could ensure they're --

16         THE COURT:  Right.  Why don't you get the two that

17   you mentioned before.  All right.

18         MR. KACHERGUS:  Yeah.

19      There's Exhibit 2.23, which is not on the list.  And that

20   is a video showing Danny Carlton's entry into the Senate wing

21   door, otherwise been referred to as the second breach of the

22   Senate wing door.

23         MS. CARTER:  Government has that as admitted as

24   well.

25         THE COURT:  All right.  2.23 admitted.

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1    THE CLERK:  Your Honor, just for clarification, is

2  1.101 admitted?

3    THE COURT:  Yes.

4    MS. CARTER:  Yes.

5    THE CLERK:  Okay.  Thank you.

6    THE COURT:  That should be admitted.

7    MR. KACHERGUS:  And then I have on the government's

8  list, that would be the Senate wing door.  It's on the list

9  where Mr. Weeks and Mr. Carlton are leaving the building, but

10  I think that's already in.

11    And then I have Exhibit 3.210 –– or, excuse me, 3.21.

12  And this was a video clip showing Mr. Weeks entering the

13  bathroom on the first floor of the Capitol.

14    THE COURT:  I don't think the government admitted

15  that.  3.20?  Yeah.

16    MR. KACHERGUS:  I did during Agent McLeod's

17  testimony.

18    THE COURT:  I remember seeing it.

19    MS. CARTER:  3.21.  The government had no objection.

20  It was admitted during cross-examination yesterday.

21    THE COURT:  All right.

22    MR. KACHERGUS:  It's 3.21.  I misspoke.  Not 3.210.

23    THE COURT:  All right.  That's admitted for the

24  defense.

25    MR. KACHERGUS:  And that's all I have, Your Honor.

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1         THE COURT:  All right.  Thank you.

2     All right.  That's the exhibits.  You can also go

3  through -- the government can -- at the end of the case, with

4  the courtroom deputy, Ms. Hill, to make sure her list is the

5  same as your list.

6     All right.  If the government's ready to address the

7  Court in their closing argument of the case, I'll hear that,

8  and then we'll proceed with defense side of it.

9         I have pulled the instructions that have been used in

10  these trials of each of these counts against Mr. Weeks by

11  various judges of the Court setting forth all the elements of

12  the offenses.  I have those here.  Let me get my notes ready.

13     Ms. Carter, are you going to argue for the government?

14         MS. CARTER:  Yes, Your Honor.

15         THE COURT:  Okay.

16         MS. CARTER:  With the Court's indulgence, I'm just

17  pulling up a couple slides.

18     Your Honor, Mr. Weeks came to the Capitol Building in

19  Washington, D.C. for a purpose.  It was a planned trip.  It

20  was not a trip that he spontaneously got involved in.  We know

21  that based on his messaging prior to the day using various

22  methods on his cell phone.

23     He came because he believed that the election had been

24  stolen.  He came because this was his 1776, as he said in his

25  own words.

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1   He's been charged with five different counts.  I will

2   speak to counts in order.  There is some overlap between the

3   proof of what applies to each of the counts as we go through.

4   So beginning with Count 1, which is an obstruction of an

5   official proceeding, and breaking it out a little bit into the

6   elements, the defendant attempted to or did obstruct or impede

7   an official proceeding.

8   So as the Court is aware from Government Exhibit 6.07,

9   the official proceeding did, in fact, go forward that day, as

10  per the statute, on the day and at the time that it was

11  supposed to proceed.

12  It was, in fact, interrupted during the time that those

13  members were in their separate chambers trying to deal with

14  objections.

15  And the reason it was interrupted is because a group of

16  rioters had gathered out on the west lawn, as well as other

17  places, but, for purposes of this case, focusing on the west

18  lawn, and had overwhelmed police repeatedly as they were

19  trying to keep them away from the building.

20  I'm going to play briefly a clip of 4.07 and also 1.88.

21  1.88 is the WhatsApp message using Bradley Weeks's own

22  words to describe what was happening as he was on the west

23  front and what he was seeing.

24  Technology has a way of making this harder than it has to

25  be.  Let me -- with the Court's indulgence, I'll try that

1    again.

2         (Government Exhibits 4.07 and 1.88 played in open court.)

3         MS. CARTER:  And now the visual has disappeared.

4    Technology, what can you do?

5         So, as you have seen in multiple exhibits from the

6    government, both in Mr. Weeks's own words, as well as by video

7    captured of other people of the events, Mr. Weeks had ample

8    opportunity to observe law enforcement officers being

9    overwhelmed.

10        Mr. Weeks had the opportunity to observe bike rack

11   fencing manned by Capitol police.

12        If Your Honor will reference Government's Exhibit 2.01,

13   which is the first of the CCV videos that we've put before the

14   Court from Capitol police, you'll see that in that video you

15   can actually see bike rack fencing manned by a very few

16   Capitol police officers.

17        That's the first time that we see Mr. Weeks coming into

18   that area right there by the Capitol in the northwest lawn.

19   He approaches them and makes a movement.

20        There's no sound, so we don't know what he's saying, but

21   he's expressing himself by moving his mouth, and he is

22   hunching over repeatedly because he is passionate about

23   whatever he is saying.  We can't tell what it is, but he's

24   hunching over in a manner that expresses a deep emotion.

25        We've heard in Mr. Weeks's own words that he had been

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1  pepper-sprayed, that the crowd around him -- that the people

2  in front of him had gotten the worst of it.

3          We've seen on video Mr. Weeks's head turn toward that

4  explosion.  And when that popping sound comes and that big

5  cloud of gas, his head turns, and he looks toward the center

6  of the west front where the media tower is crawling with

7  people, where there's a huge crowd that's attacking the

8  officers.

9          We know from the video evidence that's presented to the

10  Court -- and if Your Honor could see this, it would be 2.21.

11          You would see, in 2.21, MPD officers being overrun -- I'm

12  sorry, not MPD -- capitol police officers being overrun on the

13  northwest stairs.

14          There we go.

15          In addition to the Capitol police CCV video, which is a

16  part of that compilation in 2.21, we also know that Mr. Weeks

17  himself was in a position to see that same event from the

18  ground.

19          We know that because of Government's Exhibit 4.07, which

20  theoretically would play, but Your Honor can go back and

21  review Government's 4.07, which shows Mr. Weeks hopping up on

22  a small elevated wall near the northwest stairs and cheering

23  by raising his arm repeatedly in the air as the Capitol police

24  are chased up those stairs.

25          He is directly interacting with what is happening around

1    him.  He doesn't turn.  He doesn't leave.  Instead, he

2    continues to participate, and he goes and he climbs bike rack

3    fencing.  He climbs up on those stairs, and he sends his wife

4    a WhatsApp message.

5        He sends his wife -- I'm going to switch to my notes.  He

6    sends his wife a WhatsApp message expressing, "Breached the

7    Capitol.  I'm going in, we're going in."

8        He knows what he's doing at that moment is breaching the

9    Capitol.  And while he is not yet inside the building and will

10   not be until about 3:08 -- this is about 2:15 -- he's

11   expressing this as what his intent is at that time.

12       We know that the actual -- both houses of Congress were

13   interrupted, and they were interrupted because the building

14   itself had been breached.

15       Mr. Weeks was not among the first people coming in

16   through that Senate wing door at 2:13 that Your Honor saw on

17   the video.  However, Mr. Weeks is interacting by cheering on

18   the people down on the ground, by assisting people who have

19   been affected by pepper spray.

20       He is there as he lifts his co-defendant up onto that

21   wall.  He's there interacting with the person who is behind

22   him as he's giving his 1776 speech.  He is interacting and he

23   is using language that expresses that he is with them.

24       "We're doing this, we're busting down the door, we've

25   been pepper sprayed."

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1      Your Honor has three different ways to approach Count 1.

2      Count 1, we have the obstruction itself, that Mr. Weeks

3  obstructed Congress, which I will argue that he did while he

4  was in the building, that he did while he was a part of that

5  mob that was basically overwhelming law enforcement

6  repeatedly, that he did when he was on that upper northwest

7  terrace, as he was outside of the area where doors and windows

8  had been busted open, and the Capitol was vulnerable to

9  continued entry.

10      THE COURT:  Does it make any difference that he came

11  physically into the Capitol after Congress had recessed

12  because of the rioters?

13      MS. CARTER:  No, Your Honor.  It is our position

14  that that obstruction is a continuing one.  And there's more

15  than one bases that Your Honor could find in order to support

16  that in these facts.

17      Your Honor could rely on the fact that we have a Capitol

18  police officer who described how, if anyone had come in during

19  any joint session, that that, in and of itself, would cause a

20  building-wide lockdown.

21      You also had testimony that, in order to complete a joint

22  session, the houses have to be able to walk across the Rotunda

23  from one house to the other house in order to complete that

24  session.  That's how it physically works.  They walk that same

25  path every time.

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1          So in locking down the building, even if they had not

2     been evacuated, they would, nevertheless, have not been able

3     to proceed because, once they had dealt with whatever

4     objection was currently pending and the Senate returned over

5     to the House side, they would not have been able to accomplish

6     that.

7          In addition, you heard that they had to do multiple

8     sweeps of the building, because of the sheer volume of people,

9     to make sure they had gotten everyone and that there were no

10     continuing threats to members of Congress before they were

11     able to proceed.

12          Your Honor also has information from —— and I'm going

13     blank on the exhibit number, but from the overview video,

14     about the timing of when the building begins to be cleared and

15     also from the video regarding the proceedings themselves, that

16     there's a substantial gap in time from the building being

17     cleared and them actually being able to go back into the

18     chambers and proceed.

19          So that, again, corroborates the fact this is an ongoing

20     issue.  It took that amount of time, even after the building

21     is cleared, for them to be able to proceed.

22          So Mr. Weeks, although he is not at the forefront of the

23     people who are bursting into the building, is, nonetheless, a

24     part of that obstruction and did play a role with his presence

25     inside the building and, I would also argue, outside the

1    building in choosing not to leave.

2         The defendant intended to obstruct or impede the official

3    proceeding.

4         With regards to his intent evidence, it is very clear

5    that Mr. Weeks had a great deal to say about the election

6    prior to the events and had actually started a Facebook group

7    focusing on this.

8         So, in his own words, "Danny Carlton and I are going to

9    D.C. for a January 6th protest, slash, revolution.  We will be

10   packing."

11        And, again, not arguing that he had his long guns with

12   him at the Capitol.  I want to be very clear on that, but what

13   the point of that is, is that he's planning for violence.  He

14   knows ahead of time that this may go badly.

15        "It's either going to be the biggest Victory party the

16   world has ever seen or we're going to burn the whole fucking

17   thing down."

18        His friend replies and ends his text, "Give them hell."

19        And he says, "Yes, sir."

20        That's December 23rd.

21        We know that he had his -- he, at minimum, had shotgun

22   shells with him, that he had firearms out on his bed the day

23   before he traveled here.

24        We know that he was warned by Jana not to do anything

25   rash.  We know that his mother reached out while he was in the

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1    Capitol and said he better not be doing anything stupid.

2        We know that he said, as he was marching from the

3    Washington Monument towards the Capitol Building, stating his

4    purpose, "We are Marching to the Capitol Building, ladies and

5    gentlemen, to show these Congressmen who runs America."

6        We know, based on his statement on the actual upper

7    terrace, steps away from that door, "This is our 1776.  This

8    is where it's going to happen.  This is where tyranny will

9    fall.  This is where America will rise."

10       He said, "We are taking back the Capitol.  I'm going in."

11       These are all statements that state why he was doing what

12   he was doing.  He acted knowingly with an awareness that the

13   natural and probable effect of his conduct would be to

14   obstruct or impede the official proceeding.

15       He acted knowing that barriers were there with a vastly

16   outnumbered police force.  He acted knowing that they were

17   deploying tear gas to keep people away from the building.  He

18   acted knowing that he had not gone through security.

19       He acted knowing that people had been busting down the

20   doors because he texted his friend, "We're busting down the

21   doors."  He acted knowing that that door that he entered

22   through had an alarm that was going off per the video exhibit

23   that we put in.

24       He acted knowing that there was glass on the floor where

25   people had busted out windows to either side of the door he

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1    had entered.  He knew exactly what he was doing that day.

2        The defendant acted corruptly.  To act corruptly he has

3    to have used an unlawful means or have an unlawful or wrongful

4    purpose or both.

5        His purpose was very clear.  He had started a group for

6    15,000 people, all patriots who were fed up.  Mr. Weeks was

7    fed up.  Mr. Weeks knew, in his mind, that that election had

8    been stolen.  He knew that this was their chance to take back

9    their country, and he acted accordingly.

10       The means by which he got into the Capitol Building and

11   obstructed Congress were, on their face, not lawful.  There is

12   no logical argument to be made that someone in that situation,

13   which is shown on video, would perceive that they could enter

14   the building as a visitor in that way.

15       We do not welcome people to D.C. with tear gas.  We do

16   not welcome people to the visitors' center with officers in

17   riot gear.  Visitors to the Capitol Building do not look at

18   their little school groups and other people around them and

19   find people wearing body armor.

20       These are not things that are normal.  These are not

21   things that are lawful.  Using an overturned bike rack fence

22   to climb onto the Capitol Building is not a lawful way to

23   enter.

24       The defendant must act with consciousness of wrongdoing,

25   which means an understanding or awareness of what the person

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1   is doing is wrong or unlawful.  You need only look at his own

2   words.

3          "We've breached the Capitol.  I've already been sprayed."

4          You don't breach your friend's house when you're invited

5   for dinner.  You don't breach a building that you've been

6   invited to.  You breach a building when you know exactly that

7   you are not invited, that you are not doing something that is

8   lawful.

9          "We are busting the doors down," 1.45, also not something

10  that you do lawfully.

11         Your Honor can also approach this from an aiding and

12  abetting theory and also an attempt theory, per Count 1.  He

13  aided and abetted those around him, and he also attempted to

14  obstruct Congress through his actions.

15         So even if Your Honor does not find that he, himself,

16  obstructed Congress, although the government argues that he

17  did, Your Honor can also find under an attempt theory.

18         Count 2 is entering or remaining in a restricted building

19  or grounds.

20         Your Honor has heard from Captain Summers from the U.S.

21  Capitol Police that the building and the area around it were

22  restricted building or grounds because they were cordoned off.

23         The Vice President was visiting that day.  Your Honor has

24  also heard testimony from the Capitol Police that he was, in

25  fact, present.  He was presiding over the Senate.  And Your

1   Honor has Government's 6.07, which visually shows his presence

2   during that day.

3          He did so knowingly.

4          There are multiple communications that he had prior to

5   the day that reference Vice President Pence.  So it wasn't

6   that he didn't know the Vice President was involved in the

7   proceedings.

8          Specifically, he has a screenshot of President Trump's

9   "courage" Tweet.  Mike Pence has to show extreme courage.

10  That's not a direct quote.

11         He also has other communications, which we've introduced,

12  which show a knowledge of the proceedings for the Electoral

13  College that day.

14         Mr. Weeks was not sending one Tweet.  He wasn't sent a

15  Tweet.  He had multiple Tweets.  He had set up his Facebook

16  group.  This is something he cares deeply about and of which

17  he is informed, per his communications.

18         Count 3 is a disorderly and disruptive conduct in a

19  restricted building or grounds.

20         He engaged in disruptive and disorderly conduct both in

21  as well as in proximity to the restricted building or grounds.

22  The disorderly conduct began in the grounds themselves, as

23  Your Honor has seen on the northwest lawn.

24         There is also -- although, it is certainly not as extreme

25  as in other cases, there is a chanting moment that he has in

1  the middle of the building that, in and of itself, inside the

2  building is also disruptive conduct, disorderly conduct.

3      But his main section of behavior that would fall within

4  this category occurs on the northwest lawn and occurs on that

5  upper northwest terrace.  He was unreasonably loud and

6  disruptive and interferes by jostling or crowding.

7      Your Honor has video from the northwest lawn where he

8  very clearly is pushing through a crowd at various points.  As

9  he's on the small retaining wall by the northwest stairs, he

10  is crowding there, jostling those around him.

11      But the main thing that we have for this is his verbal

12  statements at various points as well as his cheering on of the

13  crowd around him.

14      Mr. Weeks, during the time that he is making his speech,

15  you can see behind him.  To his left, a person in a black face

16  mask, who makes a verbal affirmative and also does like a

17  fist-in-the-air cheer behind Mr. Weeks on Mr. Weeks's video.

18      In addition, when Your Honor looks at the government's

19  exhibits in the 3 series, Your Honor will see Mr. Weeks making

20  motions towards the building.  That would be both -- when the

21  Capitol Police are being chased up the stairs, he raises his

22  fist -- no, not his fist -- his hand in the air multiple times

23  towards the building.

24      Your Honor also has him turning back out towards the

25  crowd, towards the west, making a "come" motion, like this

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1  (indicating), and also, again, on Government's -- I want to

2  say it's 3.07, but I could have the numbers mixed up.

3      Another 3 series video from Sam from Infowars, he, as

4  he's close to the area by the stairs, turns towards the crowd

5  again and makes another motion.

6      All of these are disorderly and disruptive.  He did so

7  knowingly and with the intent to disrupt.  And, again, this

8  intent to disrupt is represented in all of his statements both

9  before and during these events.

10     When his mother expressed concern to him, his response

11  is, "Our country is dying."

12     When he stated his intent, "I'm going in," when he stated

13  his intent to go and that this would either be the biggest

14  victory party or they were going to burn it all down, his

15  conduct, in fact, impeded and disrupted the government's

16  ability to do its business and its official functions.  And

17  that goes back to what we've already discussed.

18     Both houses of Congress had to flee the Capitol Building.

19  They were not able to return.  They were not able to move from

20  one chamber to the other to complete their business.

21     Count 4 is disorderly or disruptive conduct in a Capitol

22  Building.  The defendant engaged in disorderly or disruptive

23  conduct inside the Capitol Building.

24     He did so with the intent to impede, disrupt, or disturb

25  the orderly conduct of a session of Congress or either House

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1   of Congress, and he acted willfully and knowingly.

2       Entering without going through security, in and of

3   itself, is disorderly, is disruptive.

4       In addition, again, while it's not the worst of the

5   events that was occurring at that particular moment, Mr. Weeks

6   also participated in the chanting that was going on in the

7   center of the Crypt.

8       The main disorderly and disruptive part of his behavior

9   inside the building was his presence.

10      You heard from the Capitol Police that, once you're in

11  the Crypt, you have access to the building.  You saw on the

12  map there are stairwells that go from that floor up to the

13  second floor.

14      His presence was disruptive.  His presence was

15  disorderly.

16      Count 5:  Parading, demonstrating, or picketing in a

17  Capitol Building.

18      He paraded, demonstrated, or picketed inside the Capitol

19  Building, one, by his presence, but also, as I mentioned

20  before, and certainly not the most egregious thing he did that

21  day, but he also chanted in the middle of the Crypt.  He did

22  so willfully and knowingly.

23      Your Honor, this ultimately comes down to the defendant's

24  actions and how they played out his intent as he had stated

25  it.  He cheered on and encouraged the rioters who were

1    attacking and overrunning officers.  He acknowledged that

2    doors were busted open.

3         He could have left, but he chose to wander further into

4    that building, filming, taking photos, making phone calls, and

5    messaging people all while the friend he supposedly was

6    rescuing, who was injured, is trailing along behind him as

7    they walked the entirety of the building twice.

8         His actions are consistent with someone who advocated for

9    this being his 1776 and his day to show Congressmen who runs

10   America.

11        Thank you.

12             THE COURT:  All right.  Thank you, Ms. Carter.  I

13   appreciate that argument.

14        Mr. Kachergus.

15             MR. KACHERGUS:  I don't have much technology.  So if

16   it fails, it won't be much of an issue.  But I'm going to try

17   to make this work.

18             THE COURT:  Well, I appreciate whatever you can

19   show.  It's fine.

20             MR. KACHERGUS:  May it please the Court, Counsel:

21        In a sense, there's a lot of agreement in this case.  The

22   facts are relatively undisputed and, I agree, it's about the

23   conduct of Mr. Weeks.

24        Not the tens or hundreds of thousands of people there,

25   but what did Mr. Weeks do himself or what did he do to

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

 1    contribute to some of the illegal actions that took place on

 2    the afternoon of January 6th, 2021.

 3         That's the question before the Court.

 4         The government would have you believe that his mere

 5    presence, a face in the crowd, would be sufficient for

 6    liability of the obstruction of official proceeding, that

 7    being part of the crowd on the lawn on the northwest portions

 8    of the grounds of the Capitol, cheering on fellow protesters,

 9    would be sufficient to have him convicted of the felony

10    obstruction of official proceeding.  I disagree.

11         And the conduct that he engaged in, in entering the

12    building, lacked the requisite specific intent to disrupt,

13    interfere, or suspend the joint session.

14         So it is the defense's position that, although Mr. Weeks

15    was present -- and we'll concede his guilt as to Count 2,

16    entering or remaining on restricted grounds -- his conduct,

17    while not admirable, is not sufficient to impose criminal

18    liability, especially with respect to the obstruction of

19    official proceeding count.

20         In reviewing it, Mr. Weeks and his friend, Danny Carlton,

21    traveled to Washington, D.C. to attend then-President Trump's

22    "Stop the Steal" rally.

23         Mr. Weeks was at the rally on the mall.  And he's not, as

24    the government would portray, ready for combat.  Here's not a

25    man with a helmet, riot shields, protective vests, combat

1  gear, ski masks, gas masks, ventilators, weapons.

2      Here's the Mr. Weeks that attended the "Stop the Steal"

3  rally on January 6th, that morning.  This is Exhibit 1.101,

4  taken at approximately 9:00 a.m. that morning.

5      At the conclusion of the rally, Mr. Weeks, still with

6  Mr. Carlton, marched to the Capitol, as urged on by the

7  President himself, leaving the mall at approximately

8  1:15 p.m., as established in Exhibit 1.32-A, taken from the

9  phone of Mr. Weeks showing him and the thousands of others

10  proceeding from the mall towards the Capitol.

11      The men arrived at the Capitol after a large group of

12  protesters had already arrived.  They arrived somewhere in the

13  neighborhood of 1:30.

14      Mr. Weeks's purpose in going to the Capitol was not to

15  interfere, suspend, or disrupt the joint session, but to voice

16  his protest as to what he believed, rightfully or wrongly, was

17  a stolen election.

18      He wasn't there to cause violence or suspend or to break

19  into the Capitol but to be heard, and not to be heard to stop

20  what was happening.  Quite to the contrary.

21      As you can see from his texts, the screenshots of Tweets

22  on his phone and text messages on his phone, he was there to

23  urge Congresspeople to reject the slate of electors that were

24  submitted by specific states.

25      That's a lawful objective.  That's not a corrupt intent.

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1   That's peaceable protest to a point.

2       Now, concededly –– we concede that Mr. Weeks is guilty as

3   to Count 2 in remaining on restricted grounds, but the purpose

4   of going there was a lawful objective, to encourage the

5   Congresspeople to take a lawful act to reject slates of

6   electors.

7       Now, some people may disagree as to whether that's lawful

8   or not, but under the Constitution and the laws of this

9   country, it's possible.

10      Unfortunately for Mr. Weeks and our nation, things began

11  to deteriorate rather rapidly.  Other protesters become

12  combative with the police officers at the scene.  And we've

13  seen that not only through ubiquity in our last year, but also

14  from the evidence in this case where you see people engaging

15  in violent clashes with police officers.

16      Mr. Weeks was not one of them.

17      In the government's close, they had him –– you see him

18  standing there on the northwest lawn on that exhibit.

19      Well, what do you see, Your Honor?  You see the bike rack

20  fencing, a line of officers, and Mr. Weeks behind the bike

21  rack fencing and the line of officers.

22      He says something –– we don't know what it is –– maybe

23  it's "Reject the slate of electors."

24      I don't need to be terribly mindful that His Honor is

25  aware that we're in a criminal courtroom, and Mr. Weeks enters

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1   this courtroom with the presumption of innocence, and the

2   government has a burden beyond a reasonable doubt.

3        And I won't belabor that as I would before a jury because

4   the Court has probably given the jury instruction on those

5   things hundreds if not thousands of times.

6        But on a preponderance of evidence, where we're talking

7   -- or not on a preponderance.  On a beyond a reasonable doubt

8   standard, what does that show?  That he's behind the gate and

9   compliant with police orders.  There's nothing disruptive

10  about that at all.  He's just protesting what he believed was

11  an irregular election.

12       During this time, the government would have you convict

13  Mr. Weeks of aiding and abetting the obstruction of justice

14  charge by doing such things as pouring water into other

15  protesters' eyes that were burning from tear gas and pepper

16  spray.

17       I submit that an act of compassion for one's fellow man

18  to stop their suffering is not sufficient to impose an aiding

19  and abetting liability.  He's being compassionate.  He's not

20  committing a crime.

21       It is only after the police leave the foot of the

22  northwest stairway at the Capitol that Mr. Weeks does climb

23  the bike rack, enter the stairs, and go up to the northwest

24  terrace.

25       It's at that point in time that Mr. Weeks and his

1   companion, Mr. Carlton, get separated.

2        It is at this time, approximately 2:20 p.m., and we know

3   from the testimony from Mr. Gazelle yesterday that the Senate

4   had been called to recess and the House was shortly about to

5   do the same when Mr. Weeks records his impassioned speech up

6   on the northwest terrace.

7        The government maintains that the recording constitutes a

8   basis of conviction, that that speech that he recorded was

9   sufficient to find him guilty of obstruction of justice or

10  aiding and abetting, despite no one seeing it until well after

11  the events of the day subsided because he couldn't push it out

12  on social media at the scene except for, apparently, one man

13  who was nearby already on the west terrace.

14       And, according to the government, he's waving his hand or

15  nodding his head in support of Mr. Weeks.

16       Well, beyond a reasonable doubt, does he even hear

17  Mr. Weeks, or is he just waving to the tens of thousands below

18  him on the northwest lawn?  Does he even hear Mr. Weeks?  You

19  have no idea.  You can't tell from that video.

20       That's Mr. Weeks speaking into his cell phone, and

21  there's no one else around except for, apparently, this one

22  man that we don't know what that one man goes on to do or not.

23  He may have left.

24       But the government would have you convict Mr. Weeks of

25  obstruction for that act despite any clear evidence that

1     anyone was affected by it.

2          As I stated before, at this time the Senate had already

3     been recessed, the House was about to do so, with all of the

4     members leaving their respective chambers.

5          And then the Court asked Ms. Carter, during her close,

6     does the fact that Mr. Weeks entered the building after the

7     joint session had been recessed in any way matter as to

8     whether Mr. Weeks' guilt or innocence?  Very astute question.

9          And I think the answer is, it depends.

10         What was his intent when he entered the building?  If he

11    intended to go there to continue to disrupt, to avoid the

12    sessions from taking place, yes, you could be guilty despite

13    the sessions being recessed, but you have to have the intent

14    to commit that criminal act.  Mr. Weeks did not have such

15    intent.

16         Mr. Weeks gets separated from Mr. Carlton while on the

17    west terrace and after attempted failed calls.  They couldn't

18    communicate.  And you heard from Agent McLeod yesterday of the

19    call and it's of zero seconds.  It wasn't connected.

20         And then Mr. Weeks receives a text from his companion,

21    Mr. Carlton --

22              THE COURT:  Let me ask you a question on intent for

23    a minute before you go forward to the next step.

24         While he was there on the steps at all, his remarks about

25    the "Capitol's been breached, we've breached the Capitol, I'm

1   going in," where did that occur in the time frame of him

2   getting into the Capitol eventually?

3           MR. KACHERGUS:  I don't recall if that's part of his

4   impassioned speech or some other piece of evidence, but it's

5   at about that time.

6       At the time that he does it, I want to say it's

7   roughly -- I'd have to look at the exhibits, but we know that

8   Mr. Weeks is there approximately 1:30.  Mr. Carlton goes into

9   the building at 2:48.  Mr. Weeks goes in at 3:08.

10      When he puts that out on social media, Your Honor, it's

11  hyperbole.  It's talking, "We're going in, we're going in."

12      But at the time of the speech, Mr. Weeks is on the

13  northwest terrace or even below on the lawn.  He's not going

14  in.  He's not making any effort to go in.  It's mere hyperbole

15  on a text message on the internet.

16      And we know that he wasn't going in from the text from

17  Mr. Carlton that's displayed before the Court, Exhibit 1.69.

18      Mr. Weeks gets separated from Mr. Carlton while on the

19  west terrace, and the calls get missed.  And then he receives

20  this text from Mr. Carlton at 3:02 p.m.  The proceedings had

21  already been suspended.  Mr. Weeks is outside.

22      Mr. Carlton, who, I can't help but fail to note, did not

23  get charged with a felony despite what we saw yesterday being

24  at the tip of the spear, breaching the door.  He's inside.

25      Now, Mr. Carlton certainly appeared to breach the

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1  building and intend to obstruct, but Mr. Weeks didn't aid him

2  in that effort other than maybe driving him to Washington,

3  D.C., but that was completely unforeseeable to him.

4         THE COURT:  No.  I was just thinking when he said

5  "We have breached, I'm going in" reflects that he must have

6  been in a position where he could see the doors being breached

7  and decided he would go in.  It may take him a while to get

8  there, but it seems to me logical.

9         MR. KACHERGUS:  There was probably some knowledge of

10  the commotion that was taking place --

11         THE COURT:  Yeah.

12         MR. KACHERGUS:  -- because the door got breached

13  twice.  But Mr. Weeks got away from it, as you can see from

14  his texts.

15      Mr. Carlton, 3:02 p.m. if you do the conversion with UTC.

16      Mr. Weeks, "I'm all the way on the left side of the

17  building at the Capitol."

18      He's over at the end of the Senate building, far away

19  from the west door.  He's getting away from that scene when

20  his friend texted him that, "Where are you at?"

21      "Inside by the window.  We breached."

22      Mr. Weeks had nothing to do with that.  That's

23  Mr. Carlton that's going in.  Mr. Weeks was going towards the

24  other end of the building.  He's down at the end of the Senate

25  building.  Outside of it, I might add.

1    Mr. Weeks:  "You're inside?"

2    More of Exhibit 1.69.

3    Mr. Carlton to Mr. Weeks, now at 3:04 p.m:  "Burning up

4  and leg injuries.  Yeah.  Just stepped out for air."

5    Well, we saw the video.  Mr. Carlton never stepped out

6  for air.  He remained in the hallway right outside the Senate

7  wing door the entire time, leaning against the wall, sending

8  these text messages.

9    "If you're out, stay out, and I'll find you."

10    Mr. Weeks responds –– that text is sent at 3:07, and

11  Mr. Weeks responds at 3:08.  And given the radio traffic and

12  all the cellular communications, it appears two ships passed

13  in the night.

14    "I'm inside now."

15    And we saw Mr. Weeks' entry.  We saw what the situation

16  was when Mr. Weeks entered, quite dramatically different from

17  the situation when Mr. Carlton entered.

18    Mr. Weeks enters at 3:08 p.m., roughly, 20 minutes after

19  Mr. Carlton entered and well after the joint sessions had been

20  recessed.  But Mr. Weeks' intent in entering the building

21  wasn't to suspend, disrupt, or any way interfere with the

22  joint session.  It's now become a rescue mission.

23    Hearing that his friend had injuries and his leg was

24  burning up, he enters the Capitol Building.  At the time

25  Mr. Weeks enters the building, the Capitol Police are no

1    longer barricading the Senate wing door.

2         The windows had already been blown out from about an hour

3    before on the first breach that we saw with a board coming

4    through and other activities from the initial rioters who

5    clearly had an intent to obstruct the proceeding.  But that

6    wasn't Mr. Weeks.

7         By the time Mr. Weeks gets to the Senate wing door, the

8    Capitol Police have stepped back.  They're along the wall on

9    the back side of the hallway.  People are flowing into the

10   building unobstructed, there's no one stopping them.

11        And I'm not saying it was okay to enter at that point

12   either, but Mr. Weeks did not enter with the intent to

13   obstruct any official proceeding.  As I said, it was a rescue

14   mission at that point.

15        As the steady flow of people are coming through the

16   Senate wing door, it takes a few minutes, despite them being

17   mere feet from one another, to find themselves, given the mass

18   entry that's now taking place.

19        You see Mr. Carlton waving his phone around.  After about

20   five minutes in a space no greater than the well we're sitting

21   in, these two men find each other.

22        The flow of people is like a rushing river coming through

23   the door at that point.  We see people climbing out windows to

24   try to get an exit.

25        Rather than swim upstream, these men that were alleged to

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1  have the intent to obstruct official proceeding, they don't go
2  to the Senate chamber that's sitting right there walled off by
3  police officers.  If you were going to obstruct, that seems
4  the place to be, does it not?
5        But instead of swimming upstream on the flow of people,
6  they head down the building with the flow to find an exit.
7        And we've seen -- in our era of ubiquitous surveillance,
8  we have almost the entirety of their path through the Capitol
9  captured on the video.  They walk down the hallway, they enter
10 the Crypt and walk through it.
11       Does Mr. Weeks perhaps chant "USA" while he's going
12 through the Capitol?  Perhaps.  We don't have sound.  It
13 appears he says something.  We don't have volume.  We don't
14 know how audible it is.  We don't know any of that.
15       But what we do know is his path through the Crypt takes
16 mere seconds.  He doesn't stop for any appreciable length of
17 time.  He's walking through it.  He doesn't join the
18 protesters.  He doesn't confront any of the law enforcement
19 officers.  He didn't do any of that stuff.
20       He walks right through the Crypt with Mr. Carlton limping
21 behind him because apparently he did get injured falling over
22 all the barricaded furniture when he breached the door.
23       They then enter the south hallway that runs underneath
24 the House of Representatives chamber.  And it's clear they're
25 attempting to leave.  They're walking to that exit door.

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1    Unfortunately for Mr. Weeks and Mr. Carlton -- you'll

2    have to excuse my French -- some knucklehead tries to reenter

3    through the door as they're coming down the hallway, and it

4    requires the Capitol Police and whoever's assisting them to

5    employ a use of force to stop this man from reentering the

6    building.  We take no issue with law enforcement's conduct on

7    that issue.

8    But in the process of doing so, we see that big galoot

9    fall back and hit his head on the column.  Nobody is coming or

10    going out of that door at that point in time.

11    Police tell Mr. Weeks and Mr. Carlton, look, you can't go

12    here, you've got to turn around.  You're not going this way.

13    They stop for a moment, figure out what they're doing,

14    turn around and walk right back the path which they came.

15    Back through the Crypt, not quite as quickly as the first

16    passthrough.  Maybe a few -- three, four minutes in the Crypt

17    before finding a bathroom.

18    Now, on cross, I discussed with Agent McLeod, did you

19    find any evidence of reconnaissance, any of these maps,

20    anything that would suggest Mr. Weeks knew where he was going,

21    was looking for, you know, offices, chambers, any of that?

22    No, none of that.

23    But yet Mr. Weeks is able to find a bathroom.  I think

24    there's a reasonable probability or a -- the evidence is such

25    that we can infer that he was given the direction of the

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1    bathroom somewhere in the Crypt, that there was one around the
2    corner.  So he goes right into it and, mercifully, is allowed
3    to use the bathroom.
4        When he leaves, they come right back down the hallway to
5    that hallway in front of the Senate wing door.  The flow is
6    now going the other way, and they're able to leave the
7    building.  And they returned to their hotel.
8        Now, the State would have you believe that Mr. Weeks is a
9    modern-day Boston Tea Party patriot.
10       It strikes me as rather odd that both his discussions
11   prior to the events of the day and thereafter, that this
12   gentleman who's plotting to overthrow the government is
13   returning to the Embassy Suites after the violent revolution.
14   It just seems a little incongruous.
15       But it is against this backdrop that Mr. Weeks is charged
16   with obstruction of an official proceeding, disorderly and
17   disruptive conduct in a restricted building or grounds,
18   disorderly conduct in a Capitol Building, parading,
19   demonstrating, or picketing in a Capitol Building, where the
20   government has the burden to prove Mr. Weeks' guilt beyond a
21   reasonable doubt.
22       And then turning to the elements of the obstruction of an
23   official proceeding, "The defendant attempted or did obstruct
24   or impede an official proceeding."
25       One, I would contend he did no such thing.  He was part

1    of a crowd outside on the lawn protesting, but he didn't do

2    anything physically himself that obstructed or impeded that

3    proceeding.

4         And here's where the defense is really focusing its

5    argument.  "The defendant intended to obstruct or impede the

6    official proceeding."

7         To the contrary, Mr. Weeks intended to voice his protest

8    to the Congresspeople to get them to reject the slate of

9    electors.  He didn't want to suspend the proceeding.  He

10   wanted them to lawfully act in a certain way that provided the

11   political benefits he sought, but he didn't want to stop,

12   interfere, or obstruct it.  He was just urging a particular

13   result.

14        "The defendant acted knowingly with awareness that the

15   natural and probable effect of his conduct would be to

16   obstruct or impede the official proceeding.  Defendant acted

17   corruptly."

18        I don't believe he acted wrongfully at all, at least not

19   with respect to his entry into the building.

20        Now, to find him guilty of the obstruction, he has to

21   have the intent to do so.  As we've seen, when he entered the

22   building, the only intent he had was to go get his friend. and

23   Then they walk through the building, and they walk back.

24        Let's talk about what they didn't do for a moment.  Well,

25   let me back that up.  Let me talk about what Mr. Weeks did not

1  do.

2      Mr. Carlton, there's an argument he may have damaged some

3  property in falling over some furniture.  Now, Mr. Weeks was

4  not part of that.

5      Mr. Weeks' intent -- when he entered, there was no

6  barricade.  When he entered, he did not destroy any property.

7  He did not deface any property.  He did not steal any

8  property.

9      He did not assault anyone.  He did not threaten any law

10  enforcement officers.  He went into no offices.  He went into

11  neither the House chamber nor the Senate chamber.

12      He walked the hallway, returning, and exited to get his

13  friend.  Why he didn't go out immediately was the flow of

14  people coming through the door, and he couldn't see it -- it

15  wasn't practical at the time.  So they sought to get another

16  exit, but the intent was not to impede or disrupt.

17          THE COURT:  What can I take from his prior

18  statements in December leading up to this whole thing as to

19  evidencing his intent on the 6th of January?

20          MR. KACHERGUS:  I think there is evidence of intent,

21  but you have to have actions that correspond with the intent

22  in order to find him guilty.

23      Personally, I believe the December stuff is hyperbole.

24  People talking on the internet tend to engage in puffery, if

25  Your Honor hasn't noticed over the years, in the 20 years of

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1    the development of the internet.

2        But that statement on the internet, I believe, was from

3    early December.  And so it may provide evidence of intent, but

4    you have to get his actions.

5        And his actions were that he was outside of the building,

6    at the edge of the Senate building, and he doesn't go in until

7    he's going to rescue his friend, as is clear from the text

8    messages.

9        So while there's evidence of intent, it needs to be

10   coupled with action, and that action has to be congruent or

11   consistent with the intent.

12       I know he entered, and it seems that way.  But in light

13   of the intervening events with Mr. Carlton, that was not his

14   intent when he indeed entered.  When you look at his action,

15   he certainly wasn't burning anything down.

16       As I was saying, he didn't threaten anyone, police

17   officers included, destroy anything, deface anything, steal

18   anything, enter any offices or any chamber.

19       And if I could respond briefly to the government's --

20   some of the arguments raised by the government.

21       The government would have you believe that his presence

22   by the bike rack fencing on the northwest lawn is somehow

23   indicative of obstruction or aiding and abetting.

24       He's complying with what's going on at that stage.

25   There's the bike rack fencing and the officers.  He's standing

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1  behind it with tens of thousands of others.  That's what he

2  does.

3      At one point, regrettably, he makes the move, after the

4  officers have retreated up the stairs, and climbs up onto the

5  balustrade and up to the terrace.  But he doesn't enter.  The

6  government would have you believe that he's cheering the crowd

7  on when he's up on the balustrade.

8      But when I asked Sergeant McLeod —— because we know

9  Mr. Weeks had a backpack on —— isn't that consistent with a

10 gentleman trying to secure a backpack onto his back?

11     "Perhaps, possibly.  That's for the Court to decide."

12     I would submit that that's what the action is showing,

13 not riling up the crowd.

14     I've addressed it already, but assisting people burning

15 from pepper spray I hardly think is evidence of aiding and

16 abetting.  It's an act of mercy by one man with his fellow

17 man.

18     The government would have you believe that he was

19 planning for violence.  He came to D.C. planning for violence,

20 because of these hyperbolic texts.

21     Well, unlike many of the people that we've seen over the

22 last year and in these videos in this case, he didn't have a

23 helmet on.  He didn't have gas masks.  He didn't have body

24 armor.  He didn't have any of the other indicia of somebody

25 preparing for combat.

1      What you have here is Mr. Weeks, as represented in 1.101,

2  on the mall.  This is hardly somebody that's preparing for

3  combat, Your Honor.  It looks like he's having breakfast out

4  of his backpack.

5      "Corruptly.  To use unlawful means or unlawful purpose."

6      Mr. Weeks was engaging –– was attempting to engage in the

7  lawful means of being heard in protesting his voice to the

8  members of Congress, not to interfere, disrupt, or suspend,

9  but to encourage them to take a particular course of action.

10 Lawful action, I may add.

11     Mr. Weeks never breached anything.  The breaches had

12 already occurred anywhere that he had went.  The Capitol

13 Police had retreated up the stairs by the time he makes his

14 way to the stairs.

15     And that's, likewise, with his entry into the building.

16     They would also have you –– and I'll turn to their other

17 charges here in a minute, but I would submit that he's not

18 guilty of either obstruction substantively or the aiding and

19 abetting.

20     I don't think that Mr. Weeks knew that the obstruction of

21 an official proceeding was going to be committed.  I think

22 that was something that took place at the scene that was

23 unanticipated or was being committed by others.

24     Now, he may have seen that when he was up on the

25 northwest terrace.  But, as I said, he left that area and went

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1   to the edge of the Senate building.  He only returned to go in

2   after he received the text from Mr. Carlton.

3         "And that the defendant knowingly performed that act or

4   acts for the purpose of aiding, assisting, or facilitating

5   others in committing the offense of obstruction."

6         I don't think anything Mr. Weeks did that day was for the

7   purpose of others to commit the obstruction offense.

8         He was there in protest, but he didn't do anything

9   himself that would encourage others to engage in that

10  despicable behavior that we now know came to happen that

11  afternoon.

12              THE COURT:  How about the government's argument that

13  his mere presence in the building, along with others, meant

14  they had to shut down and not reinstitute the official

15  proceedings of Congress until they could clear the building?

16        So it makes a difference when he came in.  He was coming

17  in as part of the group that interrupted or continued to

18  interrupt the operation of Congress.

19              MR. KACHERGUS:  It requires specific intent to have

20  that purpose.  And there was no specific intent of Mr. Weeks

21  in this instance.  And under a "beyond a reasonable doubt"

22  standard, the government hasn't proven otherwise.

23              THE COURT:  Okay.

24              MR. KACHERGUS:  "He was unreasonably loud and

25  crowding people on the northwest lawn."

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1        I don't think there's a human being that exists that

2   could not crowd somebody on that northwest lawn when you look

3   at the tens of thousands of people cramming into it.

4        And that he was jostling somebody.

5        It would be like saying that you're engaging in

6   disruptive conduct in going to a rock concert and you've got

7   general admission tickets on the floor.  That I'm jostling

8   others?  That it's disruptive conduct?  That's absurd.

9        There was nothing unreasonably loud in comparison to

10  what?

11       And we know from Officer Gazelle the events outside,

12  while troubling, while concerning, didn't cause any disruption

13  or suspension of the joint session in the building.

14       It's only after the physical breaches to the building

15  started taking place, while Mr. Weeks was still down on the

16  northwest lawn, that the joint session was suspended.

17       So I don't think he had any purpose that aligns with the

18  aiding and abetting elements.

19       And, certainly, it's impossible to engage in anything

20  that day without jostling somebody else.  I don't think anyone

21  voiced their -- that they were offended by their contact with

22  Mr. Weeks on the northwest lawn.

23       We've talked about the aiding and abetting theory with

24  this one gentleman that was either waving his hands or nodding

25  his head as he's looking over a sea of tens of thousands of

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1    people.  Whether he's reacting to them or Mr. Weeks, under the

2    "beyond a reasonable doubt" standard, is unknown.

3         They would say he engaged in disruptive conduct in a

4    Capitol Building by not going through security.  Well, there

5    was no security to go through.  I understand why, but, once

6    again, it requires the specific intent to obstruct, and when

7    he entered, he didn't have that specific intent.

8         And being just inordinately loud by chanting something in

9    the Crypt, presumably "USA," we never heard anything from

10   Mr. Weeks.  We don't know how audible it was.  We don't even

11   know what he said.

12        And so, once again, it's problematic in finding him

13   guilty under the "aiding and abetting" theory on that basis.

14        "That his mere presence was disruptive and disorderly."

15        I understand the argument, but there was a mere presence

16   of 100,000-plus people.  I think 8- to 900 of these cases have

17   been filed at this point.

18        We're going to go with "mere presence" and dragnet over

19   100,000 people for their mere presence?  That's troubling.

20        You have to do something to encourage, assist, aid

21   another.  And Mr. Weeks didn't do that.  He was merely

22   present, and that is not sufficient enough to impose criminal

23   liability.

24        Turning to the other counts.  Count 2.

25        As I said as I began, we concede Mr. Weeks' guilt on

1   Count 2.  He was aware of bike racks.  He was aware of the

2   line of police officers, and he remained on the Capitol

3   grounds and traveled up to the northwest terrace without

4   lawful authority to do so.

5       I believe the government has met their burden on that

6   case.  And, as I've said now twice, we concede Mr. Weeks'

7   guilt as to Count 2, entering or remaining on restricted

8   building or grounds.

9       Really, the grounds is what we're conceding.  Not the

10  building because that was, in essence, a necessity -- or not

11  necessity, but an emergency defense.

12      Count 3.  "Disorderly or disruptive conduct in restricted

13  building or grounds.  Defendant engaged in disorderly or

14  disruptive conduct in proximity to or any restricted building

15  or grounds."

16      Now, he was part of a protest, and he did, indeed, climb

17  the bike rack, but the second element of that charge was that

18  the defendant did so knowingly with the intent -- once again,

19  a specific intent crime -- to impede or disrupt the orderly

20  conduct of government business or official functions.

21      As I stated before, Mr. Weeks' intent, when he went

22  there, was not to disrupt or impede but to encourage a

23  particular result -- a lawful result to be enacted by the

24  Congresspeople, to reject the slate of electors.  And we know

25  that from the Tweets and the texts that were recovered from

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1    his phone.

2        The third element.  "That the defendant's conduct

3    occurred when or so that his conduct, in fact, impeded or

4    disrupted the orderly conduct of government business or

5    official functions."

6        I don't believe it was Mr. Weeks' conduct that impeded or

7    interrupted because he arrived on the scene well after the

8    proceedings had been suspended.

9        More fundamentally, we challenge that specific intent

10   element, that he didn't do anything with the specific purpose

11   to impede or disrupt.  He was encouraging a lawful result, but

12   things just went horribly south.

13       Count 4.  "Defendant is charged with disorderly or

14   disruptive conduct in a Capitol Building or grounds, that the

15   defendant engaged in disorderly or disruptive conduct in any

16   of the United States Capitol Buildings."

17       When you view Mr. Weeks' conduct within the building

18   itself, he doesn't appear to do anything terribly disruptive

19   or disorderly.

20       I've gone through the litany of things that he didn't do,

21   and the things that he did do don't appear to meet either of

22   those criteria.

23       Once again, a specific intent.  Second element.

24       "The defendant did so with the intent to impede, disrupt,

25   or disturb the orderly conduct of a session of Congress or

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1    either house of Congress."

2         Once again, that intent element is lacking.  That's not

3    why he went in.  Indeed, not why he was on the grounds at all.

4         And "the defendant acted willfully and knowingly."

5         Well, he certainly went into the building willfully and

6    knowingly, but it was for a purpose and an intent entirely

7    different than the statute requires.

8         And then Count 5, it charges the defendant with

9    "parading, demonstrating, or picketing in a Capitol Building."

10        In the first element, "the defendant paraded,

11   demonstrated, or picketed in any of the United States Capitol

12   Buildings."

13        "Parade" and "picket" have their ordinary meanings.

14        When Mr. Weeks went into the building, he walked through

15   it.  But at that time, unlike many of the other more abhorrent

16   things that we've seen arising from the events of January 6th,

17   he doesn't have a flag with a flagpole; Trump or Confederate

18   or otherwise.

19        He's wearing a ball cap.  So if that's the extent of his

20   demonstration and the Court's inclined to find him guilty for

21   wearing a Trump supporter hat, I don't think the Court is

22   inclined to do so.  But if so, that may be the only basis by

23   which to hang the Court's hat.

24        When he enters, he walks down the hallway, he walks

25   through the Crypt, he walks down the south hall, returns.

1   There isn't the chanting, the other confrontations, displays

2   of support.

3          He walks down and back and out the door he came.  And the

4   whole while they're trying to find practical egress.  So I

5   don't think that Mr. Weeks paraded.

6          He certainly didn't -- you know, the fact that he's

7   present isn't a demonstration.  He wasn't engaging for a

8   prolonged activity like many in the Crypt or other portions of

9   the building were.  He's progressing to one end and back down

10  to the other.

11         And I don't -- "picketing," ordinary meaning.

12         I didn't see a sandwich board on him or holding a sign or

13  anything that would indicate he was picketing.  So I don't

14  think there's any lawful basis by which he could be convicted

15  on that element.

16             THE COURT:  Misdemeanor.  All right.

17             MR. KACHERGUS:  Yeah.

18         In any event, Mr. Weeks traveled to the Capitol on

19  January 6th.  His purpose was to be heard, to express his

20  First Amendment rights.

21         He and tens, hundreds of thousands of people converged on

22  the Capitol thereafter at the urging of the then President,

23  but it was for a purpose not to disrupt or impede the

24  proceedings or suspend the proceedings, but to urge a

25  particular outcome.

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1       And we know that from the social media posts and the

2  Tweets and what have you.

3       Mr. Weeks regrets it.

4       And we heard from Agent McLeod yesterday, at the end of

5  his testimony.  He met with Mr. Weeks.  He was cooperative,

6  gave consent to search his phone, waived his *Miranda* rights,

7  told him what he did, didn't hold anything back.  In Agent

8  McLeod's opinion, felt he was remorseful, felt he was sincere

9  and genuine about it.

10      It's a tragedy that the events of January 6th, 2021,

11 unfolded.  It's probably the ugliest thing I've seen in my

12 lifetime in this nation.  Regrettable.

13      I regret that a man like Mr. Weeks, a good man, was

14 sucked up into it.  He's a country man from Baker County,

15 Florida.  Some may consider him a bumpkin.

16      And so when you have those forces at work that start to

17 urge people and you get mass activity happening, it produces

18 undesirable results, but not everybody involved had the

19 purpose that, in hindsight, appears that a certain star

20 chamber of politicians decided that they wanted to throw a

21 coup of our government and used ordinary citizens like

22 Mr. Weeks to accomplish those means.

23      I note none of those individuals are in a criminal

24 courtroom as we speak.  But the low-hanging fruit, because we

25 have a ubiquitous surveillance state, gets picked up and is

1    exposed to a felony for an otherwise law-abiding life.

2        That's not what this country's about, nor was the events

3    of January 6th.  That's not what this country is about.  It's

4    about treating people fairly and equitably.

5        And Mr. Weeks did not have the intent to obstruct the

6    official proceeding.  It's regrettable that he got sucked into

7    this thing, but we're hoping that Your Honor will see the

8    evidence in a proper light, applying the proper burden –– the

9    government's burden of beyond a reasonable doubt –– and find

10   Mr. Weeks not guilty of Counts 1 and 3 through 5.

11       Thank you, Your Honor.

12            THE COURT:  Thank you.  I appreciate it.

13       Does the government want a brief rebuttal?

14            MS. CARTER:  I do.

15       I can hopefully get these images to work, but if not,

16   we'll just very quickly walk through three things.

17       The timing issue that Your Honor had a question about, I

18   want to address that.  I want to address the defense theory

19   regarding his purpose being rescuing his friend, and finally

20   intent.

21       That is the thing that really separates Mr. Weeks from

22   other people who were merely present.  I do want to emphasize

23   on the front end, mere presence, in and of itself, would not

24   be sufficient for a 1512.  We're not arguing that it is.

25       It is part of the 1512.  It is part of the obstruction.

1    It is not the whole of it.

2         Per Your Honor's question about timing, if Your Honor

3    looks at the 2 series, specifically 2.02, which is a

4    CCV video, at 2:12:37 p.m., Your Honor can see Mr. Weeks at

5    that point on the ladder.

6         The message -- the WhatsApp message, which is 1.38, the

7    metadata, which is 1.38-A, indicates that this occurred at

8    2:14 p.m.  So, again, 2:12 being on the ladder, 2:14 p.m.

9    being the "breached the Capitol" WhatsApp.

10        Then if Your Honor looks at 2.03, you're going to be able

11   to see, at 2:15:28, Mr. Weeks on the first kind of landing

12   between the two sections of the northwest stairs.

13        So he's not within view of the door, which I think was

14   Your Honor's question on the previous statement.

15        And there he is again on the 2.04 exhibit at 2:15, again

16   still on that area.

17        The timing of his statement, the 1776 statement, is 2:20.

18        And then the timing of the text messages, which we're

19   going to address here, those -- that text message chain occurs

20   between 3:02 and 3:08.

21        I do want to emphasize on 1.69, because I do think it's

22   worth discussing, the timing of each of these and why I got up

23   and gave the agent an opportunity to give a time with the

24   thing in front of him -- I'm sure he hasn't memorized the time

25   of each text message -- is because it's significant.

1        The "just stepped out for air" text message happens at

2    3:05.  The entry does not happen until 3:08.  The video clip

3    that was shown during that testimony -- and I don't have a

4    clip of it here readily available -- that was shown to the

5    witness was a 3:07 time, which is that second text message,

6    "If you're out, stay out.  I'll find you."

7        So there's a three-minute lapse in time between the time

8    that Danny Carlton sends that "just stepped out for air," and

9    "I'm inside now" comes out at 3:08.

10       We know, because he's using his phone, Government's

11   Exhibit 1.70, that during that time frame, at 3:07, he's

12   making a phone call that's outgoing.

13       So he is physically holding his phone in order to make an

14   outgoing phone call -- I think that can be inferred from the

15   evidence -- during that 3:05 to 3:08 period.

16       So we would argue -- and, again, his entry is actually in

17   the 3:08 minute, per the Capitol CCV video.

18       He did not have reason to go in to rescue his friend

19   based on the text message chain.  But even if he did -- this

20   is 2.07, at 3:09, as Mr. Carlton is waving him down in that

21   area, they're within sight of that exit door.  It even has an

22   exit sign.

23       Your Honor heard video in the 3 series that was emanating

24   an alarm.  So even if you couldn't find it visually for some

25   odd reason, you could find your way towards the alarm sound at

1  that door.

2      If he was rescuing his friend and that was his purpose in

3  going in, if that was his intent, there's an exit immediately

4  available to them.

5      There is also a mention that he may or may not have been

6  able to hear what was going on around him.

7      I'm going to briefly switch to 4.17 and just play that

8  one clip with better sound since I now have a speaker for

9  today.

10      Apparently, we're either going to have sound or visual.

11      (Government Exhibit 4.17 audio played in open court.)

12          MS. CARTER:  Your Honor can judge 4.17 and the sound

13  for that to evaluate that.

14      As to his 1512 charge, there's both action and intent

15  that can be looked at for Mr. Weeks.

16      I'm sorry.  Action and words to consider his intent.

17      The action that I would point out to the Court is multi

18  step.  His actions on the west lawn, his actions on the upper

19  terrace, and also his actions in turning away from that exit

20  door and walking the length of the Capitol Building.

21      His intent can also be inferred from his words.

22      1.09.  His statement on December 23rd about this being a

23  protest, slash, revolution.  "We're going to burn the whole

24  fucking thing down."

25      His statement in 1.32, day of.  "We are marching to the

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1   Capitol Building, ladies and gentlemen, to show these

2   Congressmen who runs America."

3        His statement at 1.38.  "Breached the Capitol.  I'm going

4   in.  We're going in."

5        Which, per the evidence that I showed the Court, was in

6   between the time he climbed that ladder and the time he

7   reached that first section in the middle of the upper

8   northwest stairs.

9        "We've reached the steps.  We've had to climb

10  scaffolding.  We've had to climb ladders.  We've had to break

11  things to get through, but we've gotten through.  We've gotten

12  through and we are taking back the Capitol.  We are taking

13  back our country.  This is our 1776."

14       1.40, as he's standing on that upper northwest terrace.

15       "We've breached the Capitol.  I've already been sprayed.

16  We're busting the doors down now," as he's standing on the

17  upper northwest terrace.

18       And then, as he's inside the building, to his mother,

19  "I'm inside the Capitol Building."

20       And when she expresses dismay, he does not respond, I had

21  to rescue my friend.  He does not respond, I accidentally got

22  pushed in.  He doesn't respond, I'm allowed to be here.

23       He responds, "Our country is dying."

24       His words show what his intent was as well as his

25  actions.  And because of that, we have met our burden, and

1    we'd ask the Court to find guilty on all counts.

2         Thank you.

3              THE COURT:  All right.  Thank you, Ms. Carter.  I

4    appreciate the approach and the argument.

5         It's 11:30.  I'm going to suggest the parties have lunch.

6    I'm going to review the materials for the next couple of

7    hours.  I intend to come back and issue a ruling this

8    afternoon.

9         So I think 2:00 p.m., if you can be available, I'd

10   appreciate it.  So come back to the Court at 2:00 p.m. this

11   afternoon.

12        Let me just ask my law clerk one thing.

13        (Court confers with law clerk off the record.)

14             THE COURT:  I was asking my clerk if we have the

15   exhibits uploaded.  We don't have them uploaded.

16             MS. CARTER:  Your Honor, my last trial, what I had

17   anticipated and actually expressed to defense counsel, was

18   that we would review them one final time and then send them

19   back.

20             THE COURT:  All right.

21             MS. CARTER:  But we haven't done that quite yet.  I

22   frankly anticipated --

23             THE COURT:  I'm talking about the video exhibits so

24   I can get them online, on my computer.

25             MS. CARTER:  Yes, sir, I can do that.  I haven't

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1    checked with defense counsel.

2              MR. KACHERGUS:  We're going to need a few minutes —

3              THE COURT:  Obviously.

4              MR. KACHERGUS:  —— to ensure that they're all ——

5              THE COURT:  I want to be able to review those

6    exhibits as I consider the evidence.

7              MS. CARTER:  Yes, sir.

8              THE COURT: All right.  Thank you, then.  We'll try

9    to make two o'clock if we can.

10             MS. CARTER:  Yes, sir.  I will do that right now.

11             THE COURT: All right.  Thank you all.

12        (A recess was had from 11:32 a.m. until 2:00 p.m.)

13             THE CLERK:  Your Honor, we're back on the record in

14   Criminal Matter 21—247—1, United States of America versus

15   Bradley Wayne Weeks.

16        Counsel, please come forward and approach the lectern and

17   state your appearance for the record.

18             MS. CARTER:  Jamie Carter on behalf of the United

19   States, joined by Kate Fifield.

20             THE COURT: Good afternoon.  Thank you both.

21             MR. KACHERGUS:  Good afternoon, Your Honor.  Matthew

22   Kachergus on behalf of Bradley Weeks, seated at counsel table,

23   along with my partner, Elizabeth White.

24             THE COURT:  All right.  Thank you.

25        We're back on the record after concluding the trial this

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1   morning and hearing the closing arguments.

2       I'd asked to try to download the exhibits.  I didn't get

3   them all successfully where we could research them.  There may

4   be a couple left for counsel for the government to bring up.

5       I would like the counsel for the government to bring up

6   the videos that reflected their claims that he had made waving

7   gestures to bring in the crowd further in with him and

8   following them up in two places.

9           MS. CARTER:  Yes, sir.  There are two videos for

10  that.

11          THE COURT:  The defense claimed he had a backpack

12  that may have been involved.

13      I did review the video.  I could see the one where he was

14  first on the west lawn area near the bike racks.  I reviewed

15  that carefully when he first appeared in the primary video,

16  but I didn't see the others.

17          MS. CARTER:  Yes, sir.

18      With the Court's indulgence, one moment.  I just have to

19  find the right numbers.

20      (Video played in open court.)

21          MS. CARTER:  I'm drawing the Court's attention over

22  here.  (Indicating.)

23          THE COURT:  All right.

24      (Video played in open court.)

25          THE COURT:  What video is that, for the record, you

1    just showed?

2            MS. CARTER:  4.07.

3        And then the other is 4.10.

4        I have the gesture in 4.10-A, which is looped.  So I'll

5    go ahead and play 4.10-A, which was also submitted as a lone

6    PowerPoint slide as part of the official exhibits.

7            THE COURT:  All right.  What is loop play?  4.10-A?

8            MS. CARTER:  Yes, sir.

9            THE COURT:  All right.

10            MS. CARTER:  So the actual parent video is 4.10.

11    This is the zoom clipped with the gesture specifically looped

12    three times.  It does not occur three times.  This is a looped

13    slide.

14        (Government's Exhibit 4.10-A played in open court.)

15            MS. CARTER:  That would be at the tail end of 4.10,

16    as far as the whole exhibit.

17        I'm happy to play that parent exhibit if that's more

18    helpful.

19        (Government's Exhibit 4.10-A played in open court.)

20            THE COURT:  That's just a clip out of the one you

21    already played?

22            MS. CARTER:  No, sir.  It's a different exhibit.

23            THE COURT:  This is a different one?

24            MS. CARTER:  Yes, sir.

25            THE COURT:  Where is he in this one?

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1       MS. CARTER:  So if I go -- there's an arrow over him

2    right here.  He's to the rear of the white sign that is not

3    his sign but is in front of him in between that camera and

4    him.

5       And then I'm going to play -- the arrow will disappear.

6       (Video played in open court.)

7       THE COURT:  All right.  I see it.

8       Is that all that you had?

9       MS. CARTER:  Sorry.

10      Could I have my exhibit list back?  There was one more

11   that I was just double-checking with counsel, but I wanted to

12   make sure it was introduced before I referenced it.

13      Your Honor, I found it.  4.13, I'm going to plug in,

14   which is the Infowars video.  I'll turn the sound back on.

15      (Government's Exhibit 4.13 played in open court.)

16      MS. CARTER:  Drawing the Court's attention to this

17   here, right there.  Right there.  And I'll play that section

18   again, which is the first five seconds of the video.

19   (Indicating.)

20      (Government's Exhibit 4.13 played in open court.)

21      MS. CARTER:  And one more time, the first five

22   seconds again.

23      (Government's Exhibit 4.13 played in open court.)

24      THE COURT:  All right.  I saw him waving his arm.

25      MS. CARTER:  Yes, sir.  Thank you.

1              THE COURT:  All right.  Thank you, Counsel.

2              MS. CARTER:  Thank you, sir.

3              THE COURT:  All right.  This is before me for a

4    decision as the trier of the facts in this case and the

5    charges against Mr. Weeks.

6         Counsel has had an opportunity to argue the case.

7    There's a total of five counts against Mr. Weeks.

8         The first one, and the important one that really

9    controls, is the first count, the obstruction of official

10   proceeding and aiding and abetting in violation of 18 U.S.C.,

11   1512(c)(2) and (ii).

12        And the Court has to find the government proved beyond a

13   reasonable doubt the following elements:

14        The defendant attempted to or did obstruct or impede an

15   official proceeding; the defendant intended to obstruct or

16   impede the official proceeding; defendant acted knowingly with

17   awareness that the natural and probable cause and effect of

18   his conduct would be to obstruct or impede the official

19   proceeding; and the defendant acted corruptly.

20        "Corruptly" is required to be defined -- rather, has to

21   have found that the defendant must use unlawful means or act

22   with unlawful purpose and act with conscience of wrongdoing.

23        And, obviously, the aiding and abetting charge, with that

24   charge, is that he aided and abetted others in committing

25   obstruction of an official proceeding.

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1        And, again, to satisfy its burden of proof beyond a

2    reasonable doubt that the defendant aided and abetted others

3    in committing this offense, the government must prove again

4    others committed an obstruction of an official proceeding by

5    committing each of the elements of the offense charged that I

6    just reviewed.

7        The defendant knew the obstruction of the proceeding was

8    going to be committed or was being committed by others.

9        The defendant performed an act or acts in furtherance of

10    the offense, and the defendant knowingly performed the act or

11    acts for the purpose of aiding or soliciting or facilitating

12    or encouraging others in the commission of the offense of

13    obstruction of an official proceeding.

14        And, Fifth, the defendant did the act or acts with intent

15    that others commit the offense of obstruction of an official

16    proceeding.

17        "Proceeding" has been defined and has been stipulated to.

18        The "official proceeding" is a proceeding before

19    Congress.  I won't have to go into that further.

20        Again, he acted knowingly as to the aiding and abetting

21    if he realized what he was doing, was aware of the nature of

22    his conduct, does not act through ignorance, mistake, or

23    accident.

24        In deciding whether the defendant acted knowingly, the

25    Court may consider all the evidence including what the

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1    defendant did or said.

2         Those are the elements of the first offense of

3    obstruction.

4         In this case, the parties have stipulated, which the

5    Court appreciates, to the basic requirements of this case;

6    that is, there was a certification of electoral college vote

7    ongoing on January 6th.  So a joint session of Congress had

8    been convened, had taken a recess to each chamber to resolve

9    an issue at the time the riot got underway.

10        The House of Representatives had begun about 12:00, the

11   Senate about 12:30.  They met together at 1:00.  This was all

12   stipulated to.

13        Vice President Pence was in the Capitol Building and

14   presiding over the joint session, and at 1:15 they adjourned

15   to their separate chambers.

16        The Vice President evacuated at 2:12, and the Senators

17   then evacuated the Senate chambers.

18        And Nancy Pelosi, at 2:15, was presiding and then left,

19   and the presiding officer then declared the House in recess

20   shortly thereafter, about 15 minutes later.  It was evacuated

21   at 2:51, at the end of it.

22        The joint session was suspended, didn't resume again

23   until 8:06 of the Senate, 9:02 at the House.

24        Vice President Pence remained on the Capitol grounds,

25   went into suspension.  Then resumptive proceedings of the

1    joint session continued until it was completed at 3:44 a.m.

2    the next day.

3        The other stipulation that's important as part of this

4    group of findings for the Court is the Capitol Building and

5    grounds, which was under restrictions because the Vice

6    President was there, and the inaugural stage scaffolding on

7    the west front of the Capitol building, and the east front,

8    the staircase they described.

9        The maps are attached as exhibits of the grounds of the

10   Capitol, as well as the interior of the Capitol and the

11   Capitol security, including the map that outlined the

12   restricted areas on January 6th admitted as an exhibit, and

13   the security barriers including bike racks positioned around

14   the Capitol ground areas as well as snow fences and other

15   temporary barriers, along with signs stating "Area closed by

16   order of the United States Capitol Police."

17       And we had three witnesses testify in this case.  Captain

18   Tia Summers, Capitol Police, who was at the communications

19   section about three blocks from the Capitol and near the

20   operations section as well and was involved in multiple phone

21   calls and encouraged and helped call for extra police to come

22   from the D.C. police, et cetera.

23       And she described as well the restrictions that day and

24   what was going on in the Capitol.  She had no credibility

25   issues whatsoever.  She simply provided the action -- the

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1   testimony to outline what was going on that day and the

2   Capitol Police situation.  There was also some questions about

3   the cameras that she answered as well.

4       Additionally, we had testimony from Capitol Police

5   Officer Mark Gazelle, who had been experienced for years and

6   years with the Senate, protecting the Senate, and overseeing

7   the Electoral College votes that he had been a part of for

8   many years, and that he had discussed the concerns around the

9   breach of the Congress and what can happen when that occurred,

10  and the dangers, particularly descriptive of the evacuation of

11  the Senators as well as eventually the Congressmen, and the

12  mob being outside the building presenting a threat to the

13  physical safety of members and to the police, and the attempts

14  to guard Senate individuals and the other people in the

15  Capitol, and concerns about Vice President Pence.

16      Additionally, he described particularly the layout of the

17  Capitol and how the hallways and stairways all connected, and

18  the concerns with anyone loose in the Capitol that had not

19  gone through security; basically, why that interrupted the

20  proceedings and how the proceedings couldn't begin again after

21  being interrupted by the riot because of the danger of anyone

22  still loose because of the necessity for the Senate to walk

23  all the way through the Capitol ground hallways to get back to

24  the House to conduct the joint session, and that remained a

25  fear until they had everybody cleared.

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1    So it was evident, at least to the Court, that it wasn't

2   only the violence of breaking in that was a concern, and the

3   chanting and all, but it was anyone, whether just walking

4   around the Capitol, was still considered a threat.

5    They had not gone through security, and the Senate could

6   not resume with the House in its joint session until the

7   officers were convinced there was no strangers left in the

8   Capitol that were not supposed to be there.

9    I think that that was a problem I see in this case with

10   the defendant having walked through the Capitol.

11    Understandingly, people could say, "Well, he's just

12   walking through the Capitol, he's not causing any damage or

13   harm," but it's evident from the testimony that the Senate

14   can't resume its meeting with the House until all of the

15   people who are not supposed to be there are gone for the

16   safety of the Senators and the others in the Capitol.

17    So their presence alone does cause a difficulty.  That, I

18   thought, was an important point the government got through the

19   officer.

20    And the testimony of Supervising Special Agent Johnson

21   McCoy from the FBI, who interviewed Mr. Weeks, offered

22   materials from Mr. Weeks's telephone, which was downloaded

23   pursuant to consent, and we have those texts that we will

24   address in a minute.

25    The stipulations also covered all the photographs and

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1  closed-circuit and body-worn cameras as well as other civilian

2  videos that were put into evidence without objection.

3       When the Court sat back and reviewed the testimony of the

4  parties and the testimony of the government's witnesses and

5  then went through the exhibits, the government has a large box

6  of exhibits, but many are about some of the same subject

7  matters.  But, in any event, I had the government replay a

8  couple of exhibits.

9       It wasn't clear to me the government's argument that it

10  showed that Mr. Weeks was waving to support bringing more of

11  the rioters up to the platform, et cetera, where he was and to

12  where the police had retreated up the stairs and the people

13  were running up after them.  That wasn't clear to me during

14  the trial.

15       So seeing the exhibits this time, I listened to his

16  counsel argue maybe he was putting off and on his backpack and

17  maybe he was doing something else, but it's clear to me, as

18  the fact-finder, from those videos, that he was waving to

19  encourage the rioters to continue their attack up the hill, up

20  the steps, and into the Capitol premises.

21       So I'm going to make the following findings of fact and

22  conclusions of law in this trial in this matter considering

23  all the stipulations and the facts attested to by the

24  witnesses.  As I said, I found their credibility was not

25  challenged as to what they saw and what they indicated they

1  had done.

2      It's really -- the issue in the case is the intent of

3  Mr. Weeks, I think, more than anything else, as how we

4  determine his intent in this matter, that he attempted to or

5  did obstruct or impede an official proceeding, that he

6  intended to do that, and that he acted knowingly with the

7  awareness of the probable cause of his conduct, to obstruct or

8  impede an official proceeding, and he acted corruptly.

9      That means he used unlawful means or act or with an act

10  with unlawful purpose in an act of consciousness of

11  wrongdoing.

12      And, again, we find that by going to his statements, his

13  state of mind, and together with what his physical actions

14  were.

15      So for the facts that I'm going to find that have been

16  proven beyond a reasonable doubt, I will conclude that I'm

17  going to find Mr. Weeks guilty of Count 1, obstruction of an

18  official proceeding and aiding and abetting, in violation of

19  18 U.S.C., 15(C)(2) and (ii).

20      The facts I find as follows:  It happened that he had a

21  history in this matter that preceded the January 6th riot,

22  which I think is important to concern his actual intent in

23  these matters.

24      He had created a Facebook 2020 group he said had over

25  12,000 people -- Exhibit 103 -- and he sent a text message

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1    regarding that.

2        He had joined a group called Fraud 2021, referring to it

3    as his backup of his Face [sic] group and invited a friend to

4    join in Exhibit 1.05.

5        And then this is all starting -- actually, the first

6    Fraud 2020 was on November 10th, very shortly after the

7    election.  The other one was December 16th.

8        And then December 19th, he subscribed to a text message

9    from "Stop the Steal January 6th."  That is the Trump rally.

10        So far, just doing those is not illegal.  He was

11    protesting what he thought was a stolen election, rightfully

12    or wrongfully, what his belief was, but he had a right to

13    believe that.

14        12-21, then he had planned at that point to go to the

15    January 6th in person.

16        He said, "Me and Danny are going to D.C. January 6th if

17    you want to go."  Exhibit 1.17.

18        12-23, they sent a text that said, "Danny Carlton and I

19    are going to D.C. January 6th protest, slash, revolution.  We

20    will be packing.  This is it.  Would love to have you there if

21    you can make it.  They're expecting millions.  Trump has asked

22    for as many people to attend as possible.  It's going to be

23    either the biggest victory party the world has ever seen or

24    we're going to burn the whole effing thing down."

25    Exhibit 1.09.

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1          I think that's important in looking at his intent,

2     whether it's acting corruptly under the obstruction of an

3     official proceeding.  He had to use unlawful means or act with

4     unlawful purpose and a conscience of wrongdoing.

5          "Protest, slash, revolution.  We're going to be packing."

6          Whether he brought guns or not, that was -- at that point

7     he was obviously planning for revolution.  At least -- his

8     counsel said "hyperbole."  I have to take what you would

9     normally mean by these words.

10          "And we'll be packing.  If we don't win, we're going to

11     burn," I guess, the Capitol down.

12          Then on January 6th, he comes to "Stop the Steal" with

13     Mr. Carlton.  He goes to the rally at the Ellipse and then

14     marches to the Capitol Building.

15          At about 1:15, he records a video of the crowd marching

16     from the Washington Monument towards Constitution Avenue,

17     stating, "We're Marching to the Capitol building, ladies and

18     gentlemen, to show these Congressmen who runs America."

19     Exhibit 1.32.

20          Then at 2:03, 40 minutes later, a little more, 45, 48

21     minutes later, the video puts him on the northwest lawn of the

22     Capitol among a large group of protesters, I would say, slash,

23     rioters at that point when you look at 1.32.

24          We have other videos in the case that show the defendant

25     was among the rioters as a police officer deploying tear gas

1    canisters trying to control the mob.

2        And that's a video we've looked at -- earlier that we

3    looked at just a minute ago.  That's Exhibit 3.01-A, 3.01-B,

4    and 3.01-C.

5        You can see the tear gas coming up, and you can see

6    everyone shuffling around.  It was obviously a mob at that

7    point.  The police officers were deploying tear gas trying to

8    contain them.

9        At 2:14, Mr. Weeks sent a WhatsApp message to his wife

10   saying, "Breached the Capitol.  I'm going in, we're going in."

11   Exhibit 1.38.

12       The only thing I can take from that is that he believed

13   that the Capitol had been breached, that it had been broken

14   into by people ahead of him, and he was going in.

15       He was intending to go into the Capitol after seeing the

16   violence that was occurring and had been occurring for

17   sometime.

18       He became separated eventually from Mr. Carlton, who went

19   in earlier, actually, and more violently, which I'm not sure I

20   was aware when we had Mr. Carlton's case.

21       In any event, we had Mr. Weeks indicating that he was

22   going in at that point.

23       At 2:15, you can see them climbing the upper portion of

24   the northwest stairs, that he was climbing up a bike rack

25   turned on its side so it acted like a ladder to get to the

1   next level.

2        He then, at 2:20, records a video he posted on social

3   media later but at that time recorded.

4        "We've reached the steps.  We've had to climb the

5   scaffolding.  We've had to climb ladders.  We had to break

6   things to get through, but we've gotten through.

7        "We've gotten through, and we're taking back the Capitol.

8   We're taking back our country.  This is our 1776.  This is

9   where it's going to happen.  This is where tyranny will fall.

10  This is where America will rise.  Look at this, America.  Look

11  at this."  Exhibit 1.40.

12       And that is –– regardless of whether he posted later on

13  social media, which apparently he did do, that others were

14  around him –– and there's some evidence at least one heard

15  that, but it was all encouraging and cheering on what had

16  happened, and that he was approving of it and wanted to be

17  part of it, and he wanted to take back the Capitol.  He wanted

18  to have a revolution, 1776.  He had to go through some effort

19  to do that.

20       "We've had to climb scaffolding.  We've had to climb

21  ladders."

22       This is the point where you see the police running and

23  everybody chasing them.

24       And then I had played for me, just a minute ago, so that

25  I could be careful about what I was finding and make sure it

1  exhibited what I believed it did, the exhibits in the 4 series

2  that shows him standing up there waving his arms, encouraging

3  others to move forward, to climb up by the bike racks, to keep

4  going up the steps.  And there's at least two, if not three

5  examples of that.

6      It's clear he's not supporting his backpack and trying to

7  put it back on again.  It's very evident he's waving the other

8  rioters forward, approving, encouraging, aiding and abetting

9  the attack on the Capitol.

10     Then at 2:24, he sends the message, "We've breached our

11 Capitol.  I've already been sprayed."

12     Then at 2:26, that's Exhibit 1.45, he sends another text

13 message.  "We're busting the doors down now."  2:26.

14     Obviously, he was in a position where he could see that

15 happening, whether he was actually doing it or not, and that

16 he was sending that notice out.

17     Then 2:28 to 3:01, in that time there's various calls

18 back and forth to Weeks and Carlton -- Exhibits 1.53, 1.60,

19 1.66, 1.67, and 1.68 -- eventually ending in a series of texts

20 at 3:02 to 3:08.

21     And because he was also on the phone at one point to

22 someone else, it jumps a little bit, but Carlton asked Weeks

23 where he was at 3:02, and Weeks says, "We're on the left side

24 if you're looking at the Capitol."

25     He was up by the Capitol but on the left side up there in

1    that patio area up by the doors there, and he says –– then he
2    says to Carlton, "Where are you?" at 3:03.
3         Carlton comes back at 3:03, 4.44, "Inside by the window.
4    We breached."
5         Weeks goes back, "You're inside," question mark.
6         Carlton then sends several texts because I think
7    Mr. Weeks may have been on the phone briefly –– I'm not sure,
8    but he said that, "Burning up with leg injuries.  Just stepped
9    out for air.  If you're out, stay out.  I'll find you."  All
10   of those were from Carlton to weeks.
11        Finally, at 3:08, Mr. Weeks' response, "I'm inside now."
12        Then Carlton says, "Tell me where to meet," at 3:08.
13        They did meet about a minute later, actually coming in
14   the Senate doors where everyone else came in, and Mr. Carlton
15   already being in that same foyer area where there's the doors
16   open and there's two windows that have been broken out that
17   people are coming through as well as people coming through the
18   doorway.
19        There was an argument made that when they turned then to
20   walk down the corridor and went all the way down through the
21   Capitol, that they were simply exiting, they were looking for
22   an exit.
23        They were in the room where the exit was and where the
24   two windows were.  And if you look at that video at that time
25   frame, around Exhibit 207, 207-A, 208, you will see people did

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1    exit through that doorway even though there was a flow of

2    people coming in, and people were exiting through the windows

3    even though there had been some people coming in.

4        It was not impossible for them to exit at that time.

5    They were not, like, pushed down the corridor.  There was a

6    decision made to walk through the Capitol, and they did do

7    that.

8        At 3:10, they began to walk through the Capitol, and they

9    joined a crowd of rioters chanting "USA" in the Crypt at one

10   point.  That's 2.08-A.

11       A few minutes later, Mr. Weeks began the text exchange

12   with his mother.  It's Exhibit 1.77.  She told him, you know,

13   in essence, "Watch out, don't get yourself in trouble,"

14   et cetera, and "I don't want your grandmother to die if you

15   do."

16       He responded, instead of, Okay, mom, I understand -- and

17   his wife had also just told him a few minutes earlier, I

18   think, "Don't do anything rash."

19       His response to his mom was, "Our country is dying."

20       In other words, he was continuing with his efforts.  It

21   didn't faze him, whatever warnings his mother gave him or

22   concern.  He was more upset that he thought the country was

23   being lost, so he continued with his activities.

24       Then a few minutes later, they came back and went out

25   through the exit door they could have gone out several minutes

1    earlier but had hung around inside the Capitol.

2         I think all that is -- and he may have gotten a text back

3    from his mother a minute later than that, but in any event,

4    there's no question, after leaving, they didn't leave and go

5    back to the hotel.  They stayed around for sometime in the

6    vicinity.

7         Exhibit 183 shows he took a picture of the words that had

8    been scribbled on the wall of the Capitol, "Our House," which

9    had been a cheer that, if you're familiar with this, had been

10   happening through various rioters sharing that.

11        They also had shared a photograph they took of themselves

12   before they left, on the upper west terrace where they first

13   went into the Capitol, posing in front of the Capitol dome,

14   and you could see the police in the background.

15        But at no time through the evidence -- his intent not to

16   interfere with the election, that he didn't really want to

17   stop the steal, that that wasn't why he was there.

18        His whole approach had been since -- when he started

19   getting in this was to overthrow the operations of the

20   government according to the Constitution on the Electoral

21   College vote count.

22        I can't find anything else from his activities and his

23   statements, his own statements.

24        He may have gotten caught up in the moment with the riot

25   and the mob, and that happens.  That's unfortunate.  It

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1   happens with lynch mobs.  And the next day they regret what
2   they did, but they're still responsible for what they did.
3       I think Mr. Weeks, under Count 1, when you follow the
4   elements of the offense, he attempted to and/or did obstruct
5   or impede an official proceeding.
6       And that is the officer's testimony referred to earlier,
7   that their presence in the building -- regardless of when the
8   Senate and House adjourned and recessed, the time frame is not
9   important as long as they had been in a meeting originally to
10  do this, an official proceeding, that they had to stop and
11  could not resume as long as the rioters were in the building.
12      By Mr. Weeks contributing to that and adding his presence
13  in the building, regardless if he did anything wrong within
14  the building beyond his marching or parading or chanting in
15  walking through it, but that alone is enough to -- along with
16  all the others, to impede an official proceeding, obstructing
17  it.
18      There's no question in my mind his intent is shown by his
19  actions and his statements, what he actually did and what he
20  said that I've just reviewed; that he wanted to burn the place
21  down if they didn't stop the proceeding and vote for Mr. Trump
22  and stop the vote for President-Elect Biden.
23      He actually -- I did not go into issues with the guns
24  because I never saw any guns that he was alleged to have
25  brought to the Capitol, but there's no question there is in

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1  evidence that –– two weapons, a shotgun, and potentially a

2  30-30 rifle with multiple rounds of ammunition, that he did

3  pack to take with him, which is all going to his intent and

4  what he proceeded to do about whatever he had to do to

5  overcome the electoral process.

6      And he acted knowingly.  He is aware of the natural

7  consequences of his conduct that he intended to obstruct or

8  impede the proceeding, which he did by encouraging the rioters

9  when he was there with the waving of his arms, with his own

10 actions, climbing up this ladder they made out of the bike

11 racks, which are supposed to be obstructions so they wouldn't

12 go in there.

13     Starting from the first time we see him, he's already

14 gone through one or two fences to get where he was.  He was

15 right at the last bike rack at that time, obstruction.

16     And those obviously were torn apart and used.  And he has

17 a picture actually of the sign saying "Official Proceeding,"

18 et cetera, "Do Not Come In" and on the floor and trampled by

19 the rioters.  He obviously knew what he was doing.

20     And he acted corruptly.  That is, he used an unlawful

21 means, the riot means, climbing over the barricades, using the

22 ladder to climb up to the next level and get into the Capitol.

23     He went into the Capitol without having gone through

24 security.  He knew he wasn't supposed to be there after all he

25 went through to get there, and he texted that and he

1    advertised what he had done.

2         And he certainly had a conscience of wrongdoing.  I mean,

3    his mother told him to stay out of trouble, and others, and he

4    continued on his purpose, which at that point had become an

5    unlawful purpose.

6         Perhaps he originally wanted just to protest at the

7    rally, but it had become an unlawful purpose to go through and

8    to make sure that the proceeding was not continuing and could

9    not continue as long as he was in the building.  So I have no

10   question about that.

11        I think, also, if there's any question at all, he acted

12   to aid and abet the others in their committing of obstruction

13   of an official proceeding.

14        Others, it's been proved, obstructed the official

15   proceeding by committing the elements of the offense charged.

16        There was more than enough evidence to show people

17   violently invading the Capitol, violenting attacking the

18   police officers, violently going into the building, and

19   causing the session in Congress to be canceled and parties to

20   flee for their safety.

21        He knew that this proceeding was being committed by

22   others.  He could see it.  He was there.

23        He performed an act in furtherance of the proceeding.  He

24   did certainly with his waving others up the steps, coming to

25   attack, and through his announcement through his texts and

1   others of his speech he gave on 1776, "taking over the

2   Capitol."

3        Fourth, he knowingly performed acts for the purpose of

4   aiding and assisting, which he did just, again, from the

5   pictures we just discussed about how he acted when he was

6   going up the ladder and he saw the police running and waving

7   others to come up and invade as well.

8        And he did that with the intent that others would be able

9   to continue with the obstruction of an official proceeding,

10  continue to commit that offense.

11       So I have no problem that he has aided and abetted in

12  relation to Count 1 and can be found guilty on that basis.

13       Count 2 is entering or remaining in a restricted building

14  or grounds.

15       You have to show -- the government did -- the defendant,

16  beyond a reasonable doubt entered a restricted building or

17  grounds without lawful authority.  They've clearly showed

18  that.

19       He was on the grounds.  There's pictures of him beyond

20  the barricades in the beginning, and that later he was beyond

21  all the barricades and went into the building, and he did so

22  knowingly.  Obviously, he knew where he was going.

23       The restricted buildings are those as established by the

24  testimony of the officer and the others as to where the areas

25  were that were restricted.

1      They were all marked as being restricted, and the area

2  was being protected by -- the Vice President and the family of

3  the Vice President protected by the Secret Service was clear.

4      He's guilty of Count 2 beyond a reasonable doubt.

5      In Count 3, disorderly or disruptive conduct in a

6  restricted building or grounds.

7      You have to find, beyond a reasonable doubt, the

8  defendant engaged in disorderly and disruptive conduct in or

9  in proximity to any restricted building or grounds, that he

10 did so knowingly with the intent to impede or disrupt the

11 orderly conduct of business.

12     As to the first element, his disorderly and disruptive

13 conduct was not only standing there and sending out these

14 statements and then standing up and making the statement about

15 1776 around others, but also his actions in waving the crowd

16 forward certainly was a disorderly and disruptive conduct on

17 or near the restricted building or grounds.

18     That he did so knowingly in an attempt to impede or

19 disrupt the conduct of the business or official proceedings.

20     There's no question he knew what he was doing, that he

21 had said that he wanted to stop the steal and that he had

22 intent to impede or disrupt the orderly conduct when he joined

23 in the group charging up the steps, charging and going into

24 the Capitol.

25     Third, defendant's conduct occurred when -- so that when

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1    his conduct, in fact, impeded or disrupted the orderly conduct
2    of government business, that's not just the -- I don't mean by
3    "government business" not meant there, the electoral process.
4    They meant the whole building being invaded.  They meant
5    refusing to obey the police, going over the barricades,
6    et cetera.
7        And his conduct, in fact, did disrupt the orderly conduct
8    of government business.  That occurs when a person is
9    unreasonably loud, disrupts under the circumstances,
10   interferes with another person by jostling against and
11   unnecessarily crowding that person.
12       And a disruptive conduct is disturbance.  It interrupts
13   the activity of normal course of process.  And those occurred,
14   obviously.
15       In fact, when you first see him -- in the first video, we
16   saw him by the bike rack.  If you watch his actions closely
17   there -- and I reviewed that three or four times -- you can
18   see him -- I think the government described "crouching."
19       I think more he was sort of ducking around, but he was
20   confronting, obviously, an officer in front of him.  There was
21   no question about how he was handling himself.  And he was
22   yelling something in somewhat of a disruptive manner or a
23   disorderly manner.
24       I found him guilty, therefore, of Count 3.
25       In Count 4, disorderly or disruptive conduct in a Capitol

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1   Building or grounds, similar to Count 3.

2        Count 4.  He engaged in disorderly or disruptive conduct

3   in any of the Capitol buildings.

4        Well, he went in the Capitol Building and went through it

5   and went down to the Crypt.  And it's evident there he joined

6   the chanting of "USA, USA" as part of his activities.

7        He also got on his text and his phones at those points,

8   and he did so to impede, disrupt, or disturb the orderly

9   conduct of session of either the House or Congress.

10       Well, his presence there did disturb it, and he had to

11  know, going through the House, through the Capitol, that they

12  could not convene the House or Senate session until everyone

13  was out of the House.

14       He did so willfully and knowingly; he did.  He walked

15  through it.  He knew what he was doing and where he was going.

16  He could have exited immediately and gotten out, and that may

17  have been the best thing he could have done to save himself.

18       But, instead, he went through basically touring and

19  taking an opportunity to join the others in chanting and

20  disrupting the conduct of the session of the House by his

21  continued presence.

22       So he acts wilfully.  He acted with the intent to do

23  something the law forbids; that is to disobey the law.  Well,

24  he was trespassing, and he doesn't have to be aware of the

25  specific law.

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1       So it's clear to me the government has proved beyond a

2   reasonable doubt each of the facts necessary to establish the

3   elements of each of the offenses of Count 1 through Count 5

4   against Mr. Weeks.

5       I think there may come a time when the government, at

6   sentencing, is going to have to discuss Mr. Carlton and the

7   treatment of Mr. Carlton vis-a-vis Mr. Weeks.

8       One of the issues I did look at that had been raised

9   earlier by his defense counsel is the -- a couple of issues

10  involving the obstruction statute that he had raised.

11      So I went back and pulled a couple more recent cases that

12  have happened in our court and had been written about by our

13  judges as to whether the timing of the official proceeding

14  adjourning makes any difference.

15      And I thought the government handled that with the

16  officer that said that they couldn't resume as long as

17  strangers were loose in the Capitol.

18      A couple of cases.  One is by Judge Bates in *United*

19  *States v Brock*.  And that's 2022 Westlaw 3910549, and that's

20  pretrial motions.

21      But it was based upon the fact that if this person had

22  come in and it was after the Congress had recessed itself and

23  was out of the area, was no longer sitting, and, therefore, he

24  couldn't have caused the disruption because -- his actions,

25  the government couldn't show, he claimed, were the cause of

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1    the proceeding's adjournment because it already happened.

2          Judge Bates says, in essence, the defendant asked this

3    Court to construe 1512(c)(2) to cover only actions that

4    happened before a proceeding was first obstructed, influenced,

5    or impeded, and being in the context of January 6th, finding

6    any actions taken within the Capitol Building were a cause of

7    the obstruction and impeding them.

8          We also had arguments here that he didn't do anything in

9    the building, he didn't do anything before, for Mr. Weeks.

10          So he finds that 1512(c)(2) is not so temporally limited.

11   The statute covers anyone who corruptly obstructs, influences,

12   or impedes any official proceedings, or attempts to do so.

13          And the government may argue a wide range of actions,

14   including actions that happened after the joint session had

15   been suspended in light of the rioting mob that had entered

16   the Capitol, obstructed, influenced, or impeded the joint

17   session.

18          The joint session continued to be obstructed, influenced,

19   and impeded even after Vice President Pence and members of

20   Congress had fled, and continued to remain in limbo as the

21   January 6th mob flooded the Capitol throughout the day.

22          So the relevant question really then is not when it

23   happened, but what acts obstructed or influenced or impeded

24   the January certification as a whole.  I'm just adding my own

25   review.

1          The judge goes on to say –– Bates says, even if the Court

2    construed the statutorily required allegation that actually

3    happened before the initial instruction [sic], which it does

4    not –– in this case, the man's name is Block –– Block's

5    challenge would still fail.

6          His motion was focused on the moment he entered the

7    United States Capitol.  But, again, the statute, 1512(c), is

8    not so geographically limited.

9          The obstruction, influence, or impediment of any joint

10   session, or the attempt to do so, surely could have happened

11   before Mr. Block set foot in the Capitol.

12         There's no requirement the government allege the actions

13   take place before the joint session was suspended, no

14   requirement that alleges Block entered the Capitol at any time

15   let alone before the joint session was suspended.

16         And I think that satisfies the concern the Court had

17   raised at one point with a question in that area.

18         That was further followed up by Judge McFadden in an

19   opinion, 2022 Westlaw 43, with five zeros, *United States v*

20   *Hale-Cusanelli,* September 2022.

21         He says, Mr. Cusanelli had challenged the evidence of the

22   obstruction conviction.  He says, because the certification

23   had adjourned before he entered the Capitol, his individual

24   actions never obstructed any official proceeding.

25         This argument is, at best, self-refuting.  The defendant

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1   admits that the trial evidence showed obstruction by the

2   collective mob -- that's in a quote, "collective mob" -- on

3   January 6th.

4        As the jury observed in multiple videos, he joined that

5   mob, a fact he glosses over in his briefing now.  So, under

6   his own theory, the collective obstruction is also his

7   obstruction.

8        At any rate, his presence in the building for 40 minutes

9   at the very least prevented Congress from reconvening the

10   certification, and that qualifies as obstructing or impeding

11   an official proceeding.

12        And he has a footnote for -- well, I don't see it in my

13   copy.  In any event, I don't think that's ...

14        Finally, there is a trial in the *United States v Reffitt*,

15   that is 2022 Westlaw 1404247, by Judge Friedrich.

16        In a post-trial motion as to obstruction of an official

17   proceeding and aiding and abetting in Count 2, she claims the

18   jury could reasonably find that he attempted to or did

19   obstruct or impede an official proceeding, acted with the

20   intent to do so, and knew the material -- the natural effect

21   of his conduct would be obstructing or impeding a proceeding,

22   and could also find corruptly.

23        She refers to the instruction I just used.

24        The problem here is that this defendant never entered the

25   Capitol -- Reffitt -- entered the Capitol Building, and his

1  interaction with the Capitol Police took place before members
2  of Congress evacuated the chambers.  So nothing had happened
3  yet.
4      But the video evidence showed that Reffitt ascended the
5  west stairs and led a throng of people who first breached the
6  Capitol.  Thus, a jury could reasonably find Reffitt, by
7  leading a crowd to breach the police line, help to halt and
8  thus obstruct Congress's joint session.
9      At the very least he attempted to obstruct or aided and
10 abetted those who obstructed the proceedings.  He acknowledged
11 that Congress was there when he went in and could not finish
12 the joint session until later because it was disrupted.
13     Accordingly, a jury could find he knew and intended his
14 disruptive actions would obstruct or impede the proceeding.
15     Then she talks about, to act corruptly, the defendant
16 must use unlawful means or act with an unlawful purpose and
17 act with the conscience of wrongdoing.
18     She found that a rational trier of fact could reasonably
19 find that Reffitt aided and abetted those who had forcefully
20 assaulted or overcame the officers to enter the Capitol
21 Building.
22     Reffitt acted with unlawful purpose to physically
23 overthrow Congress, as he expressed numerous times before,
24 during, and after January 6th.  For instance, he said he was
25 going to go to D.C. to drag the traitors out.

United States v. Bradley Wayne Weeks
Bench Trial – Day 2 of 2 – and Verdict

1    This is prior to the attack on the Capitol, some days

2    prior to that, but similar to what I found we had here and I

3    thought was a problem for Mr. Weeks.

4    So I use those cases as a reference that his conduct here

5    is somewhat similar to what we had in those other cases in the

6    fact that he came into the building after it had already been

7    breached and after the Congress had recessed is no basis to

8    say the statute for obstruction of justice could not apply in

9    his case based upon his own conduct and actions.

10    So the ruling of the Court, as I said, is I enter a

11    guilty finding on each of the counts against Mr. Weeks.

12    I have a problem.  I know counsel would like to talk to

13    his client for a minute, but I have an issue that I would like

14    to talk to counsel in chambers about very briefly, when you

15    are ready, in a few minutes, and my situation.

16    So if you would all come back to my chambers just down

17    the hall and ring the bell in a few minutes when you're ready,

18    but you may need to talk to your client first.  It'll just be

19    a minute conversation.

20    Thank you.  All right.  The Court will stand in recess.

21    (Adjourned at 2:58 p.m.)

22

23

24

25

Sherri Grubbs, CSR, RPR, RMR, RDR, CRR
United States District Court, Western District of Oklahoma
(405) 609-5203 – sherri_grubbs@okwd.uscourts.gov

1                       REPORTER'S CERTIFICATE

2

3           I, SHERRI GRUBBS, Federal Official Court Reporter in

4    and for the United States District Court for the Western

5    District of Oklahoma, do hereby certify that pursuant to

6    Section 753, Title 28, United States Code that the foregoing

7    is a true and correct transcript of the stenographically

8    reported proceedings held in the above-entitled matter and

9    that the transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United States.

11

12           Dated this 3rd day of August, 2023.

13

14           /S/ SHERRI GRUBBS_____

15           SHERRI GRUBBS, RPR, RMR, RDR, CRR
             State of Oklahoma CSR Number 1232
16           Federal Official Court Reporter

17

18

19

20

21

22

23

24

25

# EXHIBIT B

 

Give　　　　　　　　Share　　　　　　　　Pray

# Erik Warner Defense Fund



Campaign Created by: **Angelina Warner**

The funds from this campaign will be received by Angelina Warner.

Goal: **USD $60,000**

Raised: **USD $ 15,827**

Erik is a brother in Christ who traveled to DC on January 6th with three other brothers in Christ, to answer the Presidential call of support. The goal of these men was to provide a watchful eye on families, woman and elderly attendees for fears of them being targeted by groups wishing to do them harm. Now Erik is being targeted by the Fede　　Need Help?　, which has brought charges against him, and have put him in the position to defend himself in Federal Court. The left-wing media has smeared his name and the effects of this have reached into every aspect of his life, including his profession. Erik Warner is a loving

 

Give

help, God Bless the gift and the giver.

**Read less**



## UPDATES

**Update #5**
**August 10, 2021**

 

Good evening everyone. Just wanted to provide a quick update. Last week at court nothing really happened or changed. We have another status hearing in October. This process is going to be very long and will last months. As I have processed all of this over the last week it's a little overwhelming to consider what this process really looks like and the impact that it will have on our family.

**Read more**

**Update #4**
**July 30, 2021**

 

Happy Friday Everyone! Erik and I continue to be overwhelmed by your blessings! Thank you so much for not only giving but for your continued Prayers and for continuing to share our campaign. You are all so greatly appreciated.

**Read more**




Give

of encouragment and prayer that have come with your donations. As my husband Erik reads them they are literally what is keeping him in a positive place right now. He is truly overwhelmed by everyone's support and positivity. As a wife it is amazing to feel the support you all have for him.

**Read more**

**Update #2**
**July 24, 2021**

 

Hi everyone, I just want to take a moment and say THANK YOU so much for all of you who have shared prayers, positive affirmations and donation with us today. We can not express the feelings of overwhelming gratitude that we have for each and everyone of you!! God is Good and we know that he has spokent to each of you to provide support for us and we are.... Well words can not express how grateful we are.

This is a trying experience. I am just in shock daily that this could be happening to so many across our country... this is happening in the United States. WoW. Our plan is to continue to fight against the charges they have filed against my husband Erik. He was standing up for all of our rights and did so peacefully! No one in this country deserves to be treated this way.

God continues to hear our prayers in amazing ways. He continues to provide for us in ways that are beyond our understanding. Thank you so much for being part of the answer to our prayers. We appreciate all you are doing to support us. Please continue to share our story and the story and need of others with the people you know.

God Bless each and every one of you!!

Angel

**Update #1**
**July 6, 2021**

 



Give

FOLLOW



## PRAYER REQUESTS

Click the Pray button to let the campaign owner know you are praying for them.

PRAY

Recent Donations



USD $
50

### AngieB

39 days ago

Happy Birthday Erik. You are not forgotten. We stand with you. God Bless you.

❤ 0

USD $
20

7/20/23, 11:20 AM GiveSendGo Ceux Warner Defense Fund: The Smoak of Freedom Fundraising.

Case 1:21-cr-00392-RCL Document 326-1 Filed 09/01/23 Page 97 of 98





Give

See all                                                                See top donations



# GiveSendGo, the place where help and hope go hand in hand.

## Start a GiveSendGo



Select Language | ▼

f  🐦  in  ▶  📷

7/20/23, 11:20 AM GiveSendGo Elik Warner Defense Fund: The Leader in Freedom Fundraising.

Case 1:21-cr-00392-RCL Document 326-1 Filed 09/01/23 Page 98 of 98




**Give**

GiveSendGo Tips          Giver Army          Help Center          Privacy Policy

© 2023 -- GiveSendGo